# EXHIBIT 2



# Office of the Attorney General - Office of Civil Rights

202 North Ninth Street · Richmond, VA 23219 · Office: (804) 225-2292 Fax: (804) 225-3294

**Complaint Questionnaire**

*The information requested on this form will help us to help you. The information submitted will determine whether your complaint will be investigated. Filing with this office does not preclude you from filing with other Federal or State Agencies.* ***Please be specific in your responses and indicate the month, day, and year of the alleged discriminatory actions.***

**1. Personal Information.**

Name: <u>Joanne</u> <u>Credle</u>
   *First*   *Middle*   *Last*

Street or Mailing Address: <u>6206 Kayla CT</u>

City/County: <u>Brandywine</u>   State: <u>MD</u>   Zip Code: <u>20613</u>

Home Number: ( ) _____ - _____   Work Number: ( ) _____ - _____

Mobile/Cell Number: <u>(703) 615 - 4358</u>   E-mail Address: _____

Time to be contacted [Day(s) and Time(s)]: <u>Any day/time</u>

Date of Birth: <u>10</u> / <u>03</u> / <u>1953</u>   Age: <u>69</u>   Sex: <u>Female</u>
   *Month*   *Day*   *Year*

Race/Ethnicity: [✔] African American/Black   [ ] American Indian   [ ] Asian/Pacific Islander
   [ ] Caucasian/White   [ ] Hispanic/Latinx   [ ] Other: _____

Person to contact if you cannot be reached: <u>Valerie Teachout, Esq.</u>

Street or Mailing Address: <u>3601 Eisenhower Ave., Suite 425, Alexandria, Virginia 22304</u>

Telephone(s): <u>(571) 513 - 6942</u> ; <u>202 449 - 8527</u>   Relationship to you: <u>attorney/representative</u>

**2. I believe that I was discriminated against by a(n):** (check any that apply)

[■] Employer   [ ] Employment/Staffing Agency   [ ] Union   [ ] Real Estate Agent/Landlord
[ ] Educational Institution   [ ] Place of Public Accommodation   [ ] Other: _____

If an Employer, how many employees does the company employ at all of its locations? <u>3,400+</u>

| | |
|---|---|
| **ATTENTION: This complaint must be filed with the Office within the time limits imposed by law. Answer all questions completely, and please attach additional pages if needed to complete your response. If you do not know the answer to a question, please answer by stating "not known." If a question is not applicable, write "N/A." When we receive this form, we will review it to determine whether we or another agency has jurisdiction and refer it appropriately.** | -- FOR OFFICIAL OCR USE ONLY --<br><br><br><br><br>Va. OCR Form 01 (Revised 01/2021) |

**2.a. Organization contact information:** *If the organization is an employer, please provide the address where you actually worked. If you worked from home, check here □ and provide the address of the office to which you reported.) If more than one employer is involved, please attach additional sheets.*

Name of Organization: **Northern Virginia Community College "NOVA"**

Street or Mailing Address: **8333 Little River Turnpike**

City: **Annandale**   State: **VA**   Zip Code: **22003**

Phone: ( **703** ) **323** - **3000**   Type of Business: **Education**

Name of Owner/Manager/ Human Resources Director: **Counsel, Hannah Stoneburner**

Job location if different from the above address: **Same**

**3. What is the reason (basis) for your claim of discrimination?** (*Example: If you feel you were treated worse that someone else because of your race, check the box next to* Race. *If you feel you were treated worse for several reasons, you should check each box that applies. If you complained about discrimination, participated in someone else's complaint, or filed a complaint or charge of discrimination and a negative action was threatened or taken by your employer, you should check the box next to* Retaliation.

■ Race    □ Color    □ National Origin    ■ Disability    □ Veteran Status

□ Sex    □ Sexual Orientation    □ Gender Identity    □ Religion    ■ Age

□ Pregnancy    □ Childbirth or related medical condition    □ Genetic Information*

□ Marital Status    ■ Retaliation

*If you checked Genetic Information, circle the type(s) of genetic information involved:
   i. Genetic testing    ii. Family medical history    iii. Genetic services (counseling, education, or testing).

*How was the genetic information obtained? _____

If you checked Color, National Origin, or Religion, please specify: _____

Other reason (basis) for discrimination (Explain): **Hostile Work Environment**

If your complaint involves employment, please answer the following questions:

What date were you hired? **04** / **01** / **1982**   What was your job title at hire? _____

What was your job title at the time of the alleged discrimination? **Coordinator of Specialized Programs**

What was the date you quit or were discharged? _____ / _____ /20 _____

Name and Title of your immediate supervisor? **Provost Diane Mucci**

**4.  What happened to you that you believe was discriminatory?** *(For example in employment, denied promotion, terminated, etc.).  Include the date of the alleged discrimination, a description of the actions taken, the name and title of each person who you believe discriminated against you.  Please be specific and attach additional pages if needed. (Example: 01/01/2020 – Terminated by John Doe, Production Supervisor)*

Please see Attachment A.

**5.  What reason(s) (if any) was given for the action taken against you?**

Please see Attachment A.

**6.  Describe any person who was in the same or similar situation as you and how they were treated.  For example, who else applied for the same job you did, had the same attendance record, or the same performance.  For each person identified, provide their name, race, sex age, national origin religion, or disability if known and it relates to your claim of discrimination.  Use additional sheets if necessary.**

Please see Attachment A.

**7.  If you are claiming discrimination based on disability, please answer the following questions:**

■ I have a disability          □ I do not have a disability          □ No disability but I am
                                  now but I did have one                treated as if I am disabled

What is the disability that you believe is the reason for the adverse action taken against you? Does this disability prevent you from doing anything? (Example: lifting, sleeping, breathing, walking, working, etc.)

Clinically diagnosed panic disorder, anxiety, and depression; Please see Attachment A, which includes responsive information to the following questions.

Do you use medications, medical equipment or anything else to lessen or eliminate the symptoms of your disability?

Did you ask your employer for any changes or assistance to do your job because of your disability? Yes

If yes, when did you ask?_____          Did you ask verbally or in writing?_____

Who did you ask (name and job title)? Provost Diane Mucci

Describe the assistance you requested? To be relieved of my fall teaching obligation

How did your employer respond? The request was denied. Please see Attachment A.

**8.  Have you filed a complaint with any other state and/or federal agency?** ■ Yes     □ No

If yes, identify the agency and date of filing: EEOC; Simultaneous Filing

**9.  Have you sought help about this situation from an attorney, union, or other source?** ■ Yes     □ No

If yes, please provide their name, address, and telephone number: Valerie Teachout,

3601 Eisenhower Ave., Suite 425 Alexandria, Virginia 22304;  (571) 513-6942 (Direct Dial) ; vteachout@spigglelaw.com

I understand that by returning this completed questionnaire to your office, I have filed on official complaint with the Office of Civil Rights. However, this does not mean that the complaint will be accepted for investigation. If accepted for investigation, The Office will notify the person or organization that I have named in my complaint. I declare under penalty of perjury that the information provided herein is true and correct to the best of my knowledge.

_____                              _____
            *Signature*                                                          *Today's Date*
                                                                                   2/24/23

---

## ATTACHMENT A

---

Dr. Credle began working at NOVA in April 1982. In her current position as the Coordinator of Specialized Programs, Dr. Credle works collaboratively with stakeholders and students in administering special programs. Unfortunately, throughout her tenure, Dr. Credle has witnessed NOVA discriminating against employees on the basis of their race. These employees include, but are not limited to, Former NOVA Dean Dr. Evette Hyder-Davis. NOVA has also brought its discriminatory animus to bear on Dr. Credle, treating her less favorably and harassing her on the basis of her race (African American), age, and disability (mental).

***NOVA discriminates against Dr. Credle on the basis of her race:***

On or about June 8, 2022, Dr. Credle was notified that the Director of College Government Affairs and Community Relations, Thomas "Dana" Dana Kaufmann (Caucasian) was removing her from the Conference for Hispanic Students ("Conference") project. Mr. Kauffman alleged that Dr. Credle was not following protocol when she allowed children to be present at the Conference; however, Dr. Credle had arranged for the children to be in a separate room, in close proximity to their parents. In addition, she had obtained prior verbal approval from the Provost, Dr. Diane Mucci[1] for the children to attend. Nonetheless, Mr. Dana Kaufmann claimed it was unlawful. Prior to June 8, 2022, the Dean of Operations, Rizwan Rahman failed to help Dr. Credle find chairs for the Conference. Instead, he merely instructed her to request help from the maintenance department.

On the evening of June 8, 2022, Dr. Credle emailed Dr. Anne Kress (NOVA President) expressing her concerns about being removed from the Conference project. With regard to Mr. Dana Kaufmann's concern about where the children were to remain during the conference, Dr. Credle told Dr. Kress that she had "asked someone to contact legal and the person did not follow up. I made [the] assumption when legal did not respond that everything was okay. If...Mr. Kaufmann and your Chief of Staff had contacted me about your concerns, my solution would have been...to have the children stay at the organization office since they already had daycare workers. So my request is to ask you to give the project back to me [to] do what I do best." On June 9, 2022, at 2:13pm, Dr. Credle emailed Provost Mucci and Mr. Dana Kaufmann regarding the rumors that were being circulated about Dr. Credle supposedly not knowing how to perform her duties. Provost Mucci responded and asked Dr. Credle to direct her concerns to her [Provost Mucci] since she is her direct supervisor. Dr. Credle replied that she was going to try to get a doctor's statement, telling Provost Mucci: "I cannot take the people talking behind my back." ***See Attachment #1, June 8 and 9, 2022, Emails Regarding False Rumors.***

On the afternoon of June 10, 2022, Dr. Credle was talking with one of her former students about her being removed the project, and Dr. Credle told the former student she felt her removal was because she is African American. Dr. Credle was the only African American NOVA employee on the Conference Committee. Andrea Scaletta (Dean Rahman's Assistant) overheard the conversation and reported it to Dean Rahman.

---

[1] In March or April 2021, Dr. Diane Mucci (Caucasian) Acting Provost, competed with two Black candidates for the Provost position. Dr. Credle emailed the President, Dr. Anne Kress (Caucasian) in support of Provost Mucci, who was ultimately selected.

On June 10, 2022, after not hearing back from Mr. Dana Kaufmann, Dr. Credle went to Mr. Dana Kaufmann's office to address the matter in person and asked him why he threw her under the bus. Mr. Dana Kaufmann refused to speak with Dr. Credle, claimed that she threatened him, and demanded she leave his office. Dr. Credle did not in any way threaten Mr. Dana Kaufmann. Immediately after leaving Mr. Dana Kaufmann's office, Dr. Credle went to Provost Mucci's office. Dr. Credle offered Provost Mucci assistance with the certificates needed for the Conference. Dr. Credle also discussed with Provost Mucci the rumors that were being strewn throughout NOVA about her supposedly not performing her job duties.

Being distraught about being removed from the program and Mr. Dana Kaufmann's hostile response, on June 10, 2022, Dr. Credle attempted to contact the Director of Human Resources and EEO, Tammy Currie. Not being able to reach Ms. Currie, Dr. Credle then contacted Charlotte Calobrisi (Associate Vice-President of HR and Dr. Credle's former immediate supervisor), who was on vacation at that time. Dr. Credle sent Ms. Calobrisi a long text on June 10, 2022, telling her what happened. In her text, Dr. Credle stated the following:

> Mucci lied on me to the campus. Rizwhan told me he has been doing my job for two days. Mucci had meeting with Kelly, Elizabeth , Sharon ,Rizhwan and his new person was, but did not Lando who is Black and had been helping out I emailed that I had certificate in my office- it stay in iffy until yesterday. Since I was leaving, I carried the certificate to her yesterday. I called her this morning and told [her] that I had made arrangements to print the certificate before she remind me that I was off the project. I shared everything with her and she act[ed as]if I was working on my own and she will have keep rope around me. I was in her office so many times about the event. She told the nonprofit that I was not available tomorrow. That I did something wrong. It was Abe project at first, but he did not do anything. I think this a goo[d] time for Freedom Riders come to Annandale, I am willing to leave if I am to pull off this pro[ject].

Dr. Credle believes that if Ms. Calobrisi had been present at NOVA on June 10, 2022, Dr. Credle would not have been suspended, because Ms. Calobrisi was familiar with Dr. Credle's excellent work ethic and would have stopped the false rumors being spread about Dr. Credle.

That evening (June 10, 2022) at approximately 8:00 p.m., Dr. Credle received an email from Ms. Currie informing Dr. Credle that she was suspended until further notice because she was a threat. ***See Attachment #2, June 10, 2022, Email Notification of Suspension.*** Upon information and belief, Ms. Currie made the decision to suspend Dr. Credle with input from Provost Mucci and Mr. Dana Kaufmann, and they did so without providing Dr. Credle the opportunity to respond to the allegations. On information and belief, Provost Mucci did not inform either Ms. Currie or Mr. Dana Kaufmann that she had given Dr. Credle verbal approval to have the children on site during the Conference for Hispanic Students.

On June 15, 2022, Dr. Credle received an email from Daniel Kaufmann, the Associate Director of Employee Relations. He explained that Employee Relations had been assigned to conduct an investigation into the unprofessional conduct she allegedly demonstrated on June 10, 2022, and that, as part of the investigation, she would be contacted to provide information related to the complaint. Mr. Daniel Kaufmann also instructed Dr. Credle that, "during the administrative leave period, you are not permitted to be present on the Annandale Campus or on any NOVA premises." ***See Attachment #3, June 15, 2022, Email from Daniel Kaufmann to Dr. Credle Regarding Investigation and Placement on Administrative Leave.***

On July 6, 2022, Dr. Credle was scheduled to attend a meeting with Mr. Daniel Kaufmann, Ms. Currie, and Ms. Calobrisi to discuss the allegations. Dr. Credle attempted to have Attorney Robert Webb attend the meeting; however, she received an email that day from Mr. Daniel Kaufmann notifying her that employees do not have a right to have an attorney present during an HR meeting, and that the meeting would begin at 4:30 p.m. between Dr. Credle and HR. Notably, Mr. Daniel Kaufmann stated in the email that, "[t]he purpose of this meeting is for you to provide HR with a response to allegations regarding your conduct on June 10, 2022." Mr. Daniel Kaufmann also noted that, "[p]er VCCS Policy 3.12.3, Suspension, your suspension with pay ends on Friday July 8th, and you will be expected to return to work on Monday July 11, 2022." ***See Attachment #4, July 6, 2022, Email from Daniel Kaufmann to Dr. Credle Regarding Suspension Meeting.***

Dr. Credle attended the meeting that afternoon, and she told them what happened with regard to the Project and what occurred on June 10, 2022. They told her she could return to work on July 11, 2022.

When Dr. Credle returned to work on July 11, 2022, Provost Mucci presented her with a Letter of Reprimand–Misconduct ("LOR"). ***See Attachment #5, July 11, 2022, Letter of Reprimand***. In the LOR, Provost Mucci alleged that on June 10, 2022, Dr. Credle "had several interactions with colleagues and co-workers on the Annandale Campus that were unprofessional and discourteous" in connection with her removal from a project on June 8, 2022. Dr. Credle refused to sign this document. The LOR claimed that Dr. Credle's interactions on June 10, 2022, included her "raising her voice and making inappropriate comments to coworkers and a community partner." Provost Mucci alleged that Dr. Credle's actions on June 10, 2022, violated DHRM Policy 2.35 Civility in the Workplace, DHRM Policy 1.60 Standards of Conduct, and constituted misconduct under VCCS Policy 3.12.0(c).

***NOVA violated Title VII, the Virginia Human Rights Act, as well as numerous DHRM and VCCS policies:***

Dr. Credle has cognizable claims against NOVA under Title VII, which makes it unlawful for an employer to "discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. 2000e-2(a)(1), and the Virginia Human Rights Act ("VHRA") (Va. Code Ann. § 2.2-3900 *et seq.*), whose purpose is to "[s]afeguard all individuals with the Commonwealth from unlawful discrimination in employment because of race, color, religion, national origin, sex, pregnancy, childbirth or related medical conditions, age, marital status, sexual orientation, gender identity, disability, or military status." Va. Code Ann. § 2.2-3900(B)(2). Title VII and the VHRA forbid discrimination when it comes to any aspect of employment, including hiring, firing, pay, job assignments, promotions, layoff, training, fringe benefits, and any other term or condition of employment.

NOVA discriminated against Dr. Credle when it removed her from a job assignment—the Conference project—on the alleged basis that she allowed children to be present at the Conference. As Dr. Credle mentioned to a former student when she was informed of her removal, she was being removed because she is African American. As the only African American on the Conference Committee before her removal, Dr. Credle's intuition as to the reasons for her removal are well-supported by the discriminatory actions which NOVA took after removing Dr. Credle from the project.

Prohibited discrimination under Title VII occurs when the employer treats an individual worse than similarly situated employees. *Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022) (citing *Bostock v. Clayton County*, --- U.S. ----, 140 S. Ct. 1731, 1740, 207 L.Ed. 2d 218 (2020)).

> To establish a prima facie case of racial discrimination in the enforcement of employee disciplinary measures under Title VII, the plaintiff must show: (1) that he is a member of the class protected by Title VII, (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees.

*Cook v. CSX Transp. Corp.*, 988 F.2d 507 (1993) (citation omitted). In the instant matter, NOVA disciplined Dr. Credle more severely than a Caucasian faculty member who engaged in misconduct similar to the misconduct which NOVA alleged that Dr. Credle engaged in. On or around May 2, 2022, Elisabeth Garibay, who was the Acting Student Life Coordinator (Race: Hispanic/Caucasian) approached Dr. Credle and was extremely rude. Dr. Credle had asked her to provide a receipt for the money she gave her for the Phi Beta Kappa Honor Society. Ms. Garibay responded that she did not have to provide her with a receipt. Dr. Credle reported her behavior via email to Dr. Anne Kress, NOVA President, on May 2, 2022. ***See Attachment #6, May 2, 2022, Email from Dr. Credle to Dr. Kress Regarding Disrespectful Colleague.*** In her email, Dr. Credle also reported that Ms. Garibay had been rude to a student. Dr. Credle further stated her belief that whenever she complained, she was "ghosted," and she made a reference to "Plantation Workers," attaching a photograph of a map depicting the close proximity of the Ravensworth Plantation to the NVCC Annandale Campus. *See id.* In addition to reporting Ms. Garibay's rude behavior to Dr. Kress, Dr. Credle reported it to Provost Mucci. Provost Mucci said she would talk to the colleague. Dr. Credle asked Provost Mucci to put the incident in the colleague's personnel record—which, upon information and belief, never happened. Dr. Credle told Dean Elle Fancher-Ruiz (Ms. Garibay's supervisor) that she hoped Ms. Garibay would not get the permanent Student Life Coordinator position because Ms. Garibay did not know how to interact with African Americans. Later, Ms. Currie asked Dr. Credle if she wanted to go to mediation in regard to Ms. Garibay. Dr. Credle declined the mediation offer and told Ms. Currie it was because she does not trust HR.[2] Ms. Garibay's behavior toward Dr. Credle had no less effect of "undermin[ing] team cohesion [or] staff morale," in violation of DHRM Policy 2.35 Civility in the Workplace, ***see Attachment #7, DHRM Policy 2.35 Civility in the Workplace,*** than Dr. Credle's alleged "disruptive and inappropriate" behavior on June 10, 2022. Yet, instead of taking any disciplinary action against Ms. Garibay, NOVA promoted Ms. Garibay from her Acting position to the permanent Student Life Coordinator position. In so doing, NOVA violated not only Title VII, but also DHRM Policy 1.60, which provides that, "Management should apply corrective or disciplinary actions consistently and in an objective and equitable manner…." DHRM Policy 1.60 at 3. ***See Attachment #8, DHRM Policy 1.60, Standards of Conduct.***

During Dr. Credle's in-person meeting with Mr. Dana Kaufmann on June 10, 2022, he continued to refuse to respond to Dr. Credle's concerns about the accusations he was publicly making about her purportedly not doing her job. Instead, he claimed that she threatened him and ordered her to leave his office. In so doing, Mr. Dana Kaufmann violated the provision in DHRM Policy 1.60 which requires that NOVA employees "[d]emonstrate respect for the agency and toward agency coworkers, supervisors, managers, *subordinates*, residential clients, students, and customers." ***See Attachment #8, DHRM Policy***

---

[2] The head of the Virginia Community College System, approximately 10 years ago, took over NOVA's HR department because of so many problems in that department. As of 2022, NOVA had resumed responsibility for the HR department. This is why Dr. Credle did not trust the HR department.

*1.60 at 4* (emphasis added). NOVA did not discipline Mr. Dana Kaufmann for violating this provision of DHRM Policy 1.60. Mr. Dana Kaufmann is Caucasian. By failing to discipline Mr. Dana Kaufmann for violating DHRM Policy 1.60, NOVA engaged in disparate discipline, in violation of Title VII and DHRM Policy 1.60's requirement that corrective or disciplinary actions be applied "in an objective and equitable manner." *See Attachment #8, DHRM Policy 1.60 at 3.*

While Provost Mucci did not identify any particular provision of DHRM Policy 1.60 Standards of Conduct that she claimed Dr. Credle violated, the undersigned surmises that it was the general policy set forth therein, which provides that, "This policy sets forth the Commonwealth's Standards of Conduct and the disciplinary process that agencies must utilize to address unacceptable behavior, conduct, and related employment problem in the workplace or outside the workplace when conduct impacts an employee's ability to do their job and/or influences the agency's overall effectiveness." *See Attachment #8, DHMR Policy 1.60 at 1.* Notably, Provost Mucci did not allege that Dr. Credle's behavior on June 10, 2022, either impacted Dr. Credle's ability to do her job or influenced the agency's overall effectiveness.

Although Provost Mucci did not point to any particular provision of DHRM Policy 1.60 that she contended Dr. Credle violated, it is easy to identify several provisions of DHRM Policy 1.60 which NOVA violated in suspending Dr. Credle. These violations are as follows:

(1) NOVA utterly failed to provide Dr. Credle the Due Process to which she is entitled. DHRM Policy 1.60 provides in pertinent part that: "Prior to the issuance of Written Notices, employees must be given oral or written notification of the offense, an explanation of the agency's evidence in support of the charge, and a reasonable opportunity to respond." *See Attachment #8, DHRM Policy 1.60 at 10.* In Ms. Currie's June 10, 2022, email to Dr. Credle notifying her that she was being placed on paid suspension effective immediately, Ms. Currie did not offer any "explanation of the agency's evidence in support of the charge," nor did she give Dr. Credle "a reasonable opportunity to respond." DHRM Policy 1.60 explains the NOVA's obligation to provide a "reasonable opportunity to respond" to mean:

> Employees must be given a reasonable opportunity to respond after receiving notification of potential disciplinary actions. Typically, a 24-hour period is a sufficient period of time, however, a 'reasonable opportunity to respond' should not be based solely on the quantity of time provided but also on the nature of the offense, the time period over which alleged events occurred, and the volume of evidence that may be presented. Based on this assessment more or less time may be granted to refute the allegations.

*Id.*

(2) NOVA violated DHRM Policy 1.60 when it removed Dr. Credle from the workplace—as Mr. Daniel Kaufmann instructed Dr. Credle in his June 15, 2022, email, *see Attachment #3*—without first determining that Dr. Credle's continued presence "may be harmful to the employee, other employees, clients, and/or patients/residents" or "hinders the agency's ability to conduct business operations." *See Attachment #8, DHRM Policy 1.60 at 11.*

(3) Ms. Currie violated DHRM Policy 1.60 when she notified Dr. Credle via email that she was being placed on suspension pending an investigation into her June 10, 2022 behavior. DHRM Policy 1.60 requires that, "[w]ritten notification of pre-disciplinary leave with pay pending a disciplinary review of agency pre-disciplinary investigation *shall be by memorandum*...." *See Attachment #8, DHRM*

*Policy 1.60 at 11* (emphasis added). The email by which Ms. Currie notified Dr. Credle of her suspension does not meet DHRM Policy 1.60's requirement that notification be issued via memorandum.

(4) NOVA violated DHRM Policy 1.60 when it removed Dr. Credle for a pre-disciplinary investigation for a period exceeding 15 workdays. DHRM Policy 1.60 provides that:

Employees may be placed on paid pre-disciplinary leave for up to fifteen workdays…If the disciplinary review or pre-disciplinary investigation is not completed within fifteen workdays…the agency must:

* Impose disciplinary action in accordance with this policy; [or]
* Permit the employee to return to work to include remote work or a temporary reassignment pending the outcome of the review or investigation...[and]
* Advise the employee of the action in writing.

*See Attachment #8, DHRM Policy 1.60 at 12*.

NOVA did not take any of the above required actions. Instead, NOVA placed Dr. Credle on paid pre-disciplinary leave for a total of 20 workdays (beginning on June 13, 2022 and lasting through July 8, 2022). In so doing, NOVA once again violated its own Standards of Conduct policy. *See id.*

(5) Mr. Dana Kaufmann violated DHRM Policy 1.60 when he refused to respond to Dr. Credle's questions and concerns about his telling people that she was not performing her job duties. DHRM Policy 1.60 requires supervisors and managers to:

serve as role models through their compliance with policies, agency protocols and best practices in leading and communicating with their subordinate employees. Expectations for supervisors[] and managers include but are not limited to:
…

* Provide consistent and objective feedback, coaching, and instructional guidance to employees regarding their performance, conduct or compliance with policies and procedures *prior to initiating corrective or formal actions*.

*See Attachment #8, DHRM Policy 1.60 at 5* (emphasis added). Instead of providing Dr. Credle with "objective feedback, coaching, and instructional guidance" regarding her supposed performance deficiencies that he was broadcasting to other NOVA employees, Mr. Dana Kaufmann refused to respond to her email, which then resulted in Dr. Credle's addressing her concerns with him in-person. During their in-person meeting, Mr. Dana Kaufmann continued to refuse to respond to Dr. Credle's concerns. Instead, he claimed that she threatened him and ordered her to leave his office. In so doing, Mr. Dana Kaufmann also violated the provision in DHRM Policy 1.60 which requires that NOVA employees "[d]emonstrate respect for the agency and toward agency coworkers, supervisors, managers, *subordinates*, residential clients, students, and customers." *See Attachment #8, DHRM Policy 1.60 at 4* (emphasis added). Without providing the required "consistent and objective feedback, coaching, and instructional guidance to [Dr. Credle] regarding [her] performance, conduct or compliance with policies and procedures *prior to initiating corrective or formal actions*," NOVA initiated Dr. Credle's suspension, thereby violating DHRM Policy 1.60 at 5.

Not only has NOVA violated DHRM Policy 1.60, it also violated VCCS Policy 3.12 relating to Faculty Sanctions. In suspending Dr. Credle without first giving her an opportunity to respond to NOVA's allegations that she acted inappropriately, NOVA violated VCCS Policy 3.12.3(c), which provides that, "*prior to taking such action* [to suspend a faculty member], vice president/executive vice president/provost shall inform the affected faculty member of the reason for the suspension and *provide the faculty member an informal opportunity to respond to the allegations*." ***See Attachment #9, VCCS Policy 3.12.3(c)*** (emphasis added). Completely bypassing its obligation to provide Dr. Credle this important opportunity to respond to the allegations brought against her, on June 10, 2022, Ms. Currie summarily issued to Dr. Credle via email a notification that she was being suspended, effective immediately. Only ***after*** Dr. Credle had served nearly four weeks on suspension, and with only two days remaining of her suspension, did NOVA finally give to Dr. Credle the opportunity on July 6, 2022[3], to respond to NOVA's inaccurate and discriminatory allegations brought against her, which were, allegedly, the impetus for the suspension.

NOVA also violated the provision in VCCS Policy 3.12.3(c), which states that it is the "president or the president's designee" who has the authority to suspend a faculty member. *See id.* At the time of Dr. Credle's June 2022 suspension, Anne Kress was NOVA's President. Dr. Credle did not receive any documentation showing that Dr. Kress had authorized her suspension, or that Dr. Kress had designated Ms. Currie, Provost Mucci, or Mr. Dana Kauffman as having the authority to suspend Dr. Credle.

As the above clearly demonstrates, NOVA violated several provisions of DHRM Policy 1.60 and VCCS Policy 3.12.3 in suspending Dr. Credle. On information and belief, NOVA has not similarly violated these policies when suspending NOVA employees who are not African American. Additionally, NOVA did not discipline Ms. Garibay for engaging in misconduct that is similar to the misconduct which NOVA claims Dr. Credle engaged in. In fact, NOVA promoted Ms. Garibay to a permanent position after her misconduct was brought to the attention of Dean Ruiz. Nor did NOVA discipline Mr. Dana Kaufmann for violating at least two provisions in DHRM Policy 1.60, one which requires that he "[p]rovide consistent and objective feedback, coaching and instructional guidance to employees regarding their performance, conduct or compliance with policies and procedures prior to initiating corrective or formal actions," ***see Attachment #8, DHRM Policy 1.60 at 5***, and the other that he "demonstrate respect for the agency and toward agency…subordinates." *Id.* at 4. Because NOVA disciplined Dr. Credle more harshly than similarly situated NOVA employees who are not African American and who violated DHRM Policies (i.e., Ms. Garibay and Mr. Dana Kaufmann), NOVA disparately disciplined Dr. Credle on the basis of her race, in violation of Title VII.

In the seminal case of *Price Waterhouse v. Hopkins,* the Supreme Court stated, "[i]n the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 250, 109 S.Ct. 1775, 1790-91 (1989). *Hopkins* has no less application in the context of race stereotyping. NOVA's actions demonstrate that it took disciplinary action against Dr. Credle based on its stereotyped belief that African Americans are angry. By suspending Dr. Credle because she purportedly raised her voice and acted in a threatening manner toward Mr. Dana Kaufmann, NOVA was acting on its stereotyped belief that African Americans who raise their voices are acting in a threatening manner. Dr. Credle was understandably upset when she was removed from the Conference—after successfully working on the project for months—and when she found out that Mr.

---

[3] Per Mr. Daniel Kaufmann's July 6, 2022, email to Dr. Credle, her suspension with pay was ending on Friday, July 8, 2022, and she was expected to return to work on Monday, July 11, 2022.

Dana Kaufmann was spreading rumors that she failed to do her job. When he failed to respond to her email making the reasonable request to discuss the matter, she went to his office. It is incredulous to believe that no one-- African American or not--would raise their voice or get upset when the person responsible for making such career-impacting accusations refuses to discuss those accusations. By suspending Dr. Credle for raising her voice while attempting to discuss the matter with Mr. Dana Kaufmann, NOVA was acting on the basis of its stereotyped belief that African Americans who raise their voices are acting in a threatening manner, in violation of Title VII. *See Price Waterhouse,* 490 U.S. at 250.

### *NOVA discriminates against Dr. Credle on the basis of her age, race, and disability:*

After Dr. Credle returned to work after being discriminatorily placed on suspension, she began to experience debilitating panic attacks. On July 13, 2022, Dr. Credle informed Provost Mucci via email that when Dr. Credle saw her earlier that day, she felt like Provost Mucci did not want to talk to her, and that is when Dr. Credle experienced a panic attack. Later that day, Provost Mucci sent to Dr. Credle via email information that Provost Mucci had requested from HR concerning the process for requesting medical accommodations. ***See Attachment #10, July 13, 2022, Emails Regarding Dr. Credle's Anxiety Attack.*** Shortly thereafter, on or around July 20, 2022, Provost Mucci informed Dr. Credle that she was expected to teach a SDV course the fall semester. ***See Attachment #11, July 20, 2022, Email from Provost Mucci to Dr. Credle.*** After Provost Mucci asked Dr. Credle to teach the SDV course, Dr. Credle disclosed to Provost Mucci that she was experiencing panic attacks, which she had never suffered prior to being suspended on June 10, 2022, and she did not think she could teach the SDV course. In response, Provost Mucci verbally suggested that Dr. Credle retire. Shocked, Dr. Credle did not respond. Dr. Credle was born in 1953. Had Dr. Credle been under the age of 40, Provost Mucci would not have suggested that Dr. Credle retire. Provost Mucci's remark was directly aimed to Dr. Credle's age. Provost Mucci did not have any legitimate, non-discriminatory reason to suggest that Dr. Credle retire, since Dr. Credle had not brought up the idea of her retiring to Provost Mucci or anyone else at NOVA.

In Provost Mucci's July 20, 2022, email to Dr. Credle, she also informed her that she would be required, effective August 8, 2022, to work on campus every Monday through Friday from 8am to 4:30pm, due to "AN campus business needs changing." It should be noted that for the past ten to fifteen years, Dr. Credle had only been required to work on campus four days per week. Despite Provost Mucci's claim that "AN campus business needs…changing" was the reason she was requiring Dr. Credle to work on campus Monday through Friday, Provost Mucci did not similarly require any of Dr. Credle's colleagues who are not African American to adhere to the five day per week on-campus requirement.

In Provost Mucci's July 20, 2022, email to Dr. Credle, she also informed her that she was being stripped of additional duties/responsibilities. More specifically, Provost Mucci informed Dr. Credle that Barbara Hopkins would be meeting with the Arlington Sheriff's Office by herself, and Ms. Hopkins would be bringing the information back to Dr. Credle. They would then collaborate and move forward in the creation of a plan to meet their course needs. Barbara Hopkins is Caucasian. Before getting this email, Dr. Credle had already talked to an individual at the Arlington County Sheriff's Office, who was on vacation around this time. Dr. Credle had everything ready for him, in terms of the classes he needed to take. Ms. Hopkins told Dr. Credle that Provost Mucci wanted Ms. Hopkins's office to handle the task. In response to Provost Mucci's July 20, 2022, email, Dr. Credle emailed the President, Dr. Anne Kress, as well as Ms. Calobrisi and Ms. Currie on July 21, 2022. In Dr. Credle's email, she stated that Ms. Hopkins told her Dr. Kress does not want her to go out and set up programs.

Dr. Credle reminded them that "[t]his was not in my letter that was issued to me when I was allowed to come back to work" and stated that, "it seem[s] to me that if I can[not] set up programs, I am useless." *See Attachment #12, July 21, 2022, Email from Dr. Credle Regarding Removal from Project.* The only response which Dr. Credle received was from Dr. Kress, in which Dr. Kress advised Dr. Credle that all matters regarding her job description and assigned duties should be discussed with Provost Mucci. *See id.* After Dr. Credle informed Dr. Kress of her concern about this project being removed from her, Ms. Hopkins texted Dr. Credle and accused Dr. Credle of getting her into trouble. On information and belief, NOVA has not removed job assignments from faculty members who are not African American when those individuals had been successfully performing those assignments. By removing this project from Dr. Credle without any legitimate reason for doing so, NOVA discriminated against Dr. Credle on the basis of her race.

On July 21, 2022, Provost Mucci sent Dr. Credle a follow up email to their July 20, 2022 meeting regarding the work week and SDV courses that were discussed. In addition, Provost Mucci informed Dr. Credle that she would need to request an accommodation in order to be removed from teaching the SDV courses. Furthermore, Provost Mucci threatened Dr. Credle when she told her that "excessive absenteeism is not permitted under VCCS or DHRM policy. Similarly, misrepresenting the reason for requesting sick leave is an abuse of sick time and is not acceptable. Any action that is a violation of policy or is not permitted may result in sanctions up to and including dismissal."

Following Provost Mucci's recommendation, in late July/early August 2022, Dr. Credle submitted a reasonable accommodation request completed by her physician, Dr. Kully Woodruff. *See Attachment #13 - Dr. Credle's Reasonable Accommodation Request.* Dr. Woodruff recommended that Dr. Credle would likely benefit from being excused from her teaching obligations for the fall semester, and that her symptoms should be reassessed in six months. Dr. Credle's reasonable accommodation request included ample medical documentation showing that she needed to be relieved of her teaching duties for the fall semester. Dr. Philicia Jefferson's Psychotherapy Intake Notes dated August 16, 2022, state that:

> She [Dr. Credle] is constantly worried about having panic attacks in her place of work. She finds herself hastily exiting the environment to avoid embarrassment and to reduce the intensity of the panic attacks. This condition impairs her ability to perform routine work-related tasks. Excessive worry and inhibitions related to classroom instruction, interaction with colleagues who subjected her to a demeaning work-related incident trigger episodes of panic.

*See Attachment # 13.1 – August 16, 2022, Psychotherapy Intake Note.*

Unfortunately, this request was denied by the Coordinator for Disabilities, Tiwana Barnes. Dr. Credle was informed that the accommodation was denied because the SDV courses were included in her performance plan.

As a company employing more than fifteen individuals, NOVA is a covered employer under the Americans with Disabilities Act, 42 U.S.C. 12111 et seq. As a person with a clinically diagnosed panic disorder, anxiety, and depression, Dr. Credle is a qualified individual with a disability and is covered under the statute. Accordingly, it is unlawful for NOVA to discriminate against her because of her disability. 42 U.S.C. § 2000e–3(a); *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013). Dr. Credle notified Provost Mucci of her recent panic attacks which were caused by not only Mr. Dana Kaufmann's falsely accusing her of being a threat to others and being unprofessional in the

workplace, but also by being unfairly placed on suspension. After informing Dr. Credle that she would have to request a reasonable accommodation in order to be relieved of her fall teaching obligation, NOVA summarily denied Dr. Credle's reasonable accommodation request. At no time did NOVA attempt to engage in the interactive process with Dr. Credle to determine what reasonable accommodations would permit Dr. Credle to perform the essential functions of her position. Instead, NOVA summarily denied her reasonable accommodation request without even suggesting that her request would cause NOVA to experience an undue burden. By refusing to engage in the interactive process and refusing Dr. Credle's requests for a reasonable accommodation, NOVA discriminated against Dr. Credle on the basis of her disability, in violation of the ADA, 42 U.S.C. § 12112(b)(5)(A).

***NOVA has created a hostile work environment for Dr. Credle:***

A hostile work environment exists when there is unwelcome behavior on the basis of a protected category that is "sufficiently severe and pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). In this case, Dr. Credle was subjected to a hostile work environment on the basis of her race, disability, and age. Mr. Dana Kaufmann and Provost Mucci's harassment beginning in May 2022 and continuing into the present constitutes "ongoing, severe, and pervasive" conduct that has materially affected Dr. Credle's work conditions. This extreme conduct has caused Dr. Credle to seek out and receive psychiatric treatment in order to address the intense anxiety she experiences. Dr. Jefferson noted in her Psychotherapy Intake Note dated August 16, 2022, the following about Dr. Credle's panic attacks:

> The origin of the condition is linked to an attack that she experienced by her supervisor who falsely accused her of being a threat to others and being unprofessional in the workplace. She feels devastated by the experience after having served the institution for over 25 years…She describes the allegations as traumatic and has resulted in a significant mental health impairment requiring professional support.

During her August 16, 2022, therapy session, Dr. Credle told Dr. Jefferson that she was dismissed from the Conference for Hispanic Students project just three days prior to the actual event, after she had completed all of the major preparations. Dr. Credle relayed to Dr. Jefferson that being removed from this project shamed her in the eyes of stakeholders, and smeared her professional reputation with students, numerous community supporters, and colleagues. Dr. Jefferson noted that, "Dr. Credle now perceives the work environment as hostile. She is unable to resume normal job functions; she fears having panic attacks during class lectures and continues to experience episodes of anxiety and panic when exposed to triggers associated with the traumatizing incident."

NOVA has cultivated and tolerated an atmosphere of harassment and hostility towards Dr. Credle. As discussed above, Mr. Dana Kaufmann violated DHRM Policy 1.60 when he refused to provide Dr. Credle with "objective feedback, coaching, and instructional guidance" regarding her supposed performance deficiencies that he was broadcasting to other NOVA employees. NOVA did not discipline Mr. Dana Kaufmann for violating this provision of DHRM Policy 1.60. Nor did NOVA discipline Mr. Dana Kaufmann for violating his obligation under DHRM Policy 1.60 to treat his subordinates (Dr. Credle) with respect. NOVA is also liable for allowing Provost Mucci, Mr. Dana Kaufmann, Ms. Currie, and Mr. Daniel Kaufmann to harass Dr. Credle when they knowingly violated DHRM Policies and VCCS Policies in relation to Dr. Credle's suspension. Finally, NOVA is liable for Provost Mucci's harassing Dr. Credle when she advised her to submit a reasonable accommodation request—which request Dr. Credle promptly complied with—then summarily denied the request without

even attempting to engage in the interactive process. NOVA is clearly liable for the effects of the harassment it knew about but did nothing to stop.

**Comparators:**

**Dr. Evette Hyder-Davis**: Former Dean of the Business Department; Race: African American; Age: 50-60 years old; disabilities: PTSD; panic attacks. Dr. Hyder-Davis was harassed and treated unfavorably by Provost Molly Lynch. Around October of 2021, Dean Davis resigned due to the discriminatory treatment.

**Jeffrey Osbourne**: Storeroom manager; Race (African American); disabilities unknown. Dean Rizwan Rahman (Dean of Operations) was Mr. Osbourne's supervisor. Dean Rahman claimed that Mr. Osbourne inappropriately raised his voice to him, and Dean Rahman requested a meeting with Provost Mucci for them to talk. Just as Dr. Credle was falsely accused of raising her voice and threatening Mr. Dana Kaufmann, Mr. Osbourne was accused of inappropriately raising his voice to Dean Rahman. These false accusations represent NOVA's discriminatory bias against African Americans based on their stereotyped notion that African Americans become threatening when they raise their voices. Mr. Osbourne resigned in September 2022.

As a result of NOVA's discriminatory actions, Dr. Credle has suffered substantial damages.

Dr. Credle requests the following relief:

1. Promotion to an Associate Dean or Dean position, with an increase in salary commensurate with the new title and additional duties of such promotion[4];
2. Expungement of all documents in Dr. Credle's personnel files relating to NOVA's suspending Dr. Credle;
3. Expungement of all documents in Dr. Credle's personnel files relating to the July 11, 2022, Letter of Reprimand;
4. Payment in the amount of $150,000 to compensate Dr. Credle for the emotional and mental distress she experienced as a direct result of NOVA's actions;
5. Full reimbursement for the amount of her Attorney's Fees, in an amount not less than $30,000, with the exact amount to be determined when Dr. Credle's other settlement requests have been resolved to the mutual satisfaction of the Parties;
6. Mutual non-disparagement provision;

In exchange, Dr. Credle is willing to execute a general release of her claims against NOVA.

---

[4] Dr. Credle had, on at least a couple occasions, requested a promotion. NOVA responded they did not have the money to promote her. This is not credible, because NOVA was consistently promoting similarly-situated individuals.

ATTACHMENT #1

**Credle, JoAnn O.**

| | |
|---|---|
| **From:** | Credle, JoAnn O. |
| **Sent:** | Wednesday, June 8, 2022 7:58 PM |
| **To:** | Kress, Anne |
| **Subject:** | Saturday event |

Dr. Kress:

I just want to let you know that I had already checked every area on the Annandale Campus for space and CF was the only place that hold the number of people the organization requested. I am a problem solver and was happy to make this work. MY goal was because of the low enrollment on Annandale and been able to serve 300 Hispanic/Lat X and wanted to make sure that it worked. My character has been challenged, because I have been working on the event for several months. Your office pull me off the event, after all the work I had done. I had a Program Cover in Spanish, financial aid form and Spanish and I was able to get Spanish Card on a 8.5 paper. I was able to get volunteers to help me move the chairs rom one part of campus to the CF Building.

I think you hire people based on the person skill set and should not be pull off an event talking to the person. Dr. Mucci was very worried about what Thomas and your Chief of Staff and she worry about her job. You know I am not afraid of my job- I am just going to do a good job. Only problem that I would say that I did wrong is not following up with legal about the children. I asked someone to contact legal and the person did not follow up. I made assumption when legal did not respond that every thing was okay. If the Mr. Kauffman and your Chief of Staff had contacted me about your concerns, my solution would have been is to have the children stay at the organization office since they already had daycare workers. So- my request is to ask you to give the project back to me do what I do best.

You are the President and I have to respect your decision.

*Joann Credle*

Joann Credle, Ed.D., NCC, LPC
Coordinator of Specialized Programs
Northern Virginia Community College
CG 218
8333 Little River Turnpike
Annandale, VA 22003
(703) 323-3205
mailto:jcredle@nvcc.edu

1

**Credle, JoAnn O.**

**From:**      Credle, JoAnn O.
**Sent:**      Sunday, June 12, 2022 8:31 AM
**To:**        jcprvb31@aol.com
**Subject:**   FW: upset

*JoAnn Credle*
Joann Credle, Ed.D., NCC, LPC
Coordinator of Specialized Programs
Northern Virginia Community College
CG 218
8333 Little River Turnpike
Annandale, VA 22003
(703) 323-3205
mailto:jcredle@nvcc.edu

**From:** Credle, JoAnn O.
**Sent:** Thursday, June 9, 2022 2:13 PM
**To:** Mucci, Diane M. <dmucci@nvcc.edu>; Kauffman, Thomas D. <tkauffman@nvcc.edu>
**Cc:** Calobrisi, Charlotte M. <ccalobrisi@nvcc.edu>; Mucci, Diane M. <dmucci@nvcc.edu>
**Subject:** upset

I am getting calls from employee stating that they heard -that I was pulled off an event because I did not know what I was doing.  I had a committee, Dr, Eftekhari, Dr. Mucci and Dr. Wyne was on the committee, but yet I am the one pull of the event.

Today:

- I had scheduled the chairs to be delivered
- Getting Signatures for the Certificates
- Setting up the registration room
- Preparing the area for the food

Tomorrow:

**Credle, JoAnn O.**

**From:** Credle, JoAnn O.
**Sent:** Thursday, June 9, 2022 2:39 PM
**To:** Mucci, Diane M.
**Subject:** RE: upset

I am going to try to get a doctor statement, I cannot take the people talking behind my back – so I need a few weeks working away from the campus.  I know based on this event, it is no need of me talking about change in my title  and I guess my evaluation will be poor.

*Joann Credle*
Joann Credle, Ed.D., NCC, LPC
Coordinator of Specialized Programs
Northern Virginia Community College
CG 218
8333 Little River Turnpike
Annandale, VA 22003
(703) 323-3205
mailto:jcredle@nvcc.edu

**From:** Mucci, Diane M. <dmucci@nvcc.edu>
**Sent:** Thursday, June 9, 2022 2:29 PM
**To:** Credle, JoAnn O. <jcredle@nvcc.edu>
**Cc:** Calobrisi, Charlotte M. <ccalobrisi@nvcc.edu>
**Subject:** RE: upset

HI JoAnn,

Please direct your concerns about this to me as your direct supervisor.  I will listen to and handle your concerns as appropriate.

Diane

**From:** Credle, JoAnn O. <jcredle@nvcc.edu>
**Sent:** Thursday, June 9, 2022 2:13 PM
**To:** Mucci, Diane M. <dmucci@nvcc.edu>; Kauffman, Thomas D. <tkauffman@nvcc.edu>

1

# ATTACHMENT #2

**From:** Credle, JoAnn O.
**Sent:** Friday, June 10, 2022 10:02 PM
**To:** Currie, Tammy M. <tcurrie@nvcc.edu>; Kauffman, Thomas D. <tkauffman@nvcc.edu>
**Cc:** Mucci, Diane M. <dmucci@nvcc.edu>; Calobrisi, Charlotte M. <ccalobrisi@nvcc.edu>; Kress, Anne <akress@nvcc.edu>
**Subject:** RE: CONFIDENTIAL: Employee Relations Matter

I was not going to show up tomorrow, I  email Jorge  and told him that I would not be at the event.
The Holy Spirit showed me that my enemy was after me and ask Charlotte to  show the text when I asked for her help.

All I want is to get back work to do my job with my students.  I hate have students hanging on receiving email that I am out and did not  finish working on a request.

Joann Credle
Joann Credle, Ed.D., NCC, LPC
Coordinator of Specialized Programs
Northern Virginia Community College
CG 218
8333 Little River Turnpike
Annandale, VA 22003
(703) 323-3205
mailto:jcredle@nvcc.edu

---

**From:** Currie, Tammy H. <tcurrie@nvcc.edu>
**Sent:** Friday, June 10, 2022 8:01 PM
**To:** Credle, JoAnn O. <jcredle@nvcc.edu>
**Cc:** Mucci, Diane M. <dmucci@nvcc.edu>
**Subject:** CONFIDENTIAL: Employee Relations Matter

Dr. Credle,
It has been brought to my attention that your behavior today has been perceived as threatening, unprofessional and overall concerning.  As a matter of precaution and in alignment with VCCS Policy 3.12.3, Suspension, I write to inform you that you are hereby placed on paid leave effective immediately and continuing until today's actions are fully investigated and a determination has been made as to whether a policy violation has occurred.
Furthermore, as standard practice, access to NOVA systems will be restricted.  Your NOVA email will remain active, and any communications regarding this matter will be sent to your NOVA email account.
Violations of any policy are taken seriously and treated with the highest degree of confidentiality.  Your cooperation in this matter is appreciated.
Sincerely,
Tammy H. Currie
Director, Human Resources and EEO

1

ATTACHMENT #3

**From:** Kaufmann, Daniel
**Sent:** Wednesday, June 15, 2022 6:51 PM
**To:** Credle, JoAnn O. <jcredle@nvcc.edu>
**Cc:** Currie, Tammy H. <tcurrie@nvcc.edu>; Mucci, Diane M. <dmucci@nvcc.edu>
**Subject:** Human Resources - Notice of Investigation

Good Evening Dr. Credle,

This is a follow-up to the email communication sent to you on Friday, June 10, 2022 from Tammy Currie, Director of Human Resources, placing you on paid leave per VCCS Policy 3.12.3, Suspension.

Employee Relations has been assigned to conduct an investigation into the alleged unprofessional conduct you demonstrated on June 10, 2022. As part of the investigation, you will be contacted to provide information related to the complaint. While this concern is being investigated, you will remain on paid administrative leave; however, the expectation is that you remain available to management during normal business hours (8:30am to 5:00pm, weekdays).

During the administrative leave period, you are not permitted to be present on the Annandale Campus or on any NOVA premises. Should you need to be on campus or NOVA property, you must contact Provost Diane Mucci or Tammy Currie, Director of Human Resources, in advance to obtain permission.

To preserve the integrity of the process, we ask that you consider this a confidential matter.

Any questions you may have should be directed to myself at **dkaufmann@nvcc.edu**.

Sincerely,

**Daniel Kaufmann**
**Associate Director, Employee Relations**
**3926 Pender Dr. Suite 150, Fairfax, VA 22030**
**Phone: 703.503.6233**
**HR Main: 703.323.3110/ Fax: 703.323.3155**
dkaufmann@nvcc.edu/ www.nvcc.edu
employeerelations@nvcc.edu




*CONFIDENTIALITY NOTICE: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise be protected by law. Any access, use, disclosure or distribution of this email message by anyone other than the intended recipient(s) is unauthorized and prohibited. If you are not an intended recipient (or an agent acting on an intended recipient's behalf), please contact the sender by reply email and immediately destroy all copies of the original message. Virus scanning is recommended on all email attachments.*

ATTACHMENT #4

**From:** Kaufmann, Daniel <dkaufmann@nvcc.edu>
**Sent:** Wednesday, July 6, 2022 2:50 PM
**To:** Credle, JoAnn O. <jcredle@nvcc.edu>
**Cc:** Currie, Tammy H. <tcurrie@nvcc.edu>; Calobrisi, Charlotte M. <ccalobrisi@nvcc.edu>
**Subject:** RE: Human Resources - Investigation Meeting Request

Dr. Credle,

Employees do not have a right to have an attorney present during an HR meeting. The meeting at 4:30pm today is between HR and yourself. The meeting will not move forward if a third party is present. The purpose of this meeting is for you to provide HR with a response to allegations regarding your conduct on June 10, 2022. You are being directed to participate. If you do not participate in the meeting, HR will move forward with a recommendation which would reflect your lack of participation in this process.

Per VCCS Policy 3.12.3, Suspension, your suspension with pay ends on Friday July 8th, and you will be expected to return to work on Monday July 11, 2022.

Sincerely,


Daniel Kaufmann
**Associate Director, Employee Relations**
**3926 Pender Dr. Suite 150, Fairfax, VA 22030**
**Phone: 703.503.6233**
**HR Main: 703.323.3110/ Fax: 703.323.3155**
dkaufmann@nvcc.edu/ www. nvcc.edu
employeerelations@nvcc.edu





*CONFIDENTIALITY NOTICE: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise be protected by law. Any access, use, disclosure or distribution of this email message by anyone other than the intended recipient(s) is unauthorized and prohibited. If you are not an intended recipient (or an agent acting on an intended recipient's behalf), please contact the sender by reply email and immediately destroy all copies of the original message. Virus scanning is recommended on all email attachments.*

---

**From:** Credle, JoAnn O. <jcredle@nvcc.edu>
**Sent:** Wednesday, July 6, 2022 12:34 PM
**To:** Stoneburner, Hannah D. <hstoneburner@nvcc.edu>
**Cc:** Currie, Tammy H. <tcurrie@nvcc.edu>; Kaufmann, Daniel <dkaufmann@nvcc.edu>; Calobrisi, Charlotte M. <ccalobrisi@nvcc.edu>
**Subject:** RE: Human Resources - Investigation Meeting Request

As I stated earlier, I have not had success with HR, so I am requesting based on my rights to have my lawyer.

## Joann Credle

Joann Credle, Ed.D., NCC, LPC
Coordinator of Specialized Programs
Northern Virginia Community College
CG 218
8333 Little River Turnpike
Annandale, VA 22003
(703) 323-3205
mailto:jcredle@nvcc.edu

**From:** Stoneburner, Hannah D. <hstoneburner@nvcc.edu>
**Sent:** Wednesday, July 6, 2022 11:50 AM
**To:** Credle, JoAnn O. <jcredle@nvcc.edu>
**Cc:** Currie, Tammy H. <tcurrie@nvcc.edu>; Kaufmann, Daniel <dkaufmann@nvcc.edu>; Calobrisi, Charlotte M. <ccalobrisi@nvcc.edu>
**Subject:** RE: Human Resources - Investigation Meeting Request

Hello Ms. Credle,

I want to acknowledge your email. As Dan stated this is an employee relations meeting and it is not appropriate for attorneys or other third parties to be present.

Sincerely,
Hannah

**Hannah D. Stoneburner**
**Associate System Counsel and Assistant Attorney General**
Office of System Counsel
Northern Virginia Community College
4001 Wakefield Chapel Road
Annandale, VA 22003

Phone:  (703) 503-6382
hstoneburner@nvcc.edu
www.nvcc.edu



**This message may contain sensitive information and/or may be covered by attorney-client privilege. It is only for the use of the intended recipient(s). If you are the intended recipient, please do not forward this email to others outside the agency.  If you are not the intended recipient(s), you are prohibited from reviewing, transmitting, disseminating, distributing, copying, or taking any action in reliance upon this information. If you have received this communication in error, please contact the sender and delete the material from your computer.**

**From:** Credle, JoAnn O. <jcredle@nvcc.edu>
**Sent:** Tuesday, July 5, 2022 6:13 PM
**To:** Kaufmann, Daniel <dkaufmann@nvcc.edu>; Calobrisi, Charlotte M. <ccalobrisi@nvcc.edu>
**Cc:** Currie, Tammy H. <tcurrie@nvcc.edu>; Stoneburner, Hannah D. <hstoneburner@nvcc.edu>
**Subject:** RE: Human Resources - Investigation Meeting Request

Ms. Stone Burner:

I am asking to my lawyer to attend my meeting because- I have a trust issue with Mr. Kauffman and Ms. Currie.

Joann Credle

Joann Credle, Ed.D., NCC, LPC
Coordinator of Specialized Programs
Northern Virginia Community College
CG 218
8333 Little River Turnpike
Annandale, VA 22003
(703) 323-3205
mailto:jcredle@nvcc.edu

**From:** Kaufmann, Daniel <dkaufmann@nvcc.edu>
**Sent:** Tuesday, July 5, 2022 5:37 PM

**To:** Credle, JoAnn O. <jcredle@nvcc.edu>
**Cc:** Currie, Tammy H. <tcurrie@nvcc.edu>
**Subject:** RE: Human Resources - Investigation Meeting Request

Good Evening Dr. Credle,

It is not NOVA's practice to allow an employee advocate or representative to be present at an investigatory meeting. An investigatory meeting is not adversarial. The purpose is fact finding and to provide you with an opportunity to respond to allegations and share your side of the story.

Please have your counsel reach out to VCCS counsel, Hannah Stoneburner at hstoneburner@nvcc.edu if they have questions regarding this process.

Thank you,

**Daniel Kaufmann**
**Associate Director, Employee Relations**
**3926 Pender Dr. Suite 150, Fairfax, VA 22030**
**Phone: 703.503.6233**
**HR Main: 703.323.3110/ Fax: 703.323.3155**
dkaufmann@nvcc.edu/ www.nvcc.edu
employeerelations@nvcc.edu





*CONFIDENTIALITY NOTICE: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise be protected by law. Any access, use, disclosure or distribution of this email message by anyone other than the intended recipient(s) is unauthorized and prohibited. If you are not an intended recipient (or an agent acting on an intended recipient's behalf), please contact the sender by reply email and immediately destroy all copies of the original message. Virus scanning is recommended on all email attachments.*

**From:** Credle, JoAnn O. <jcredle@nvcc.edu>
**Sent:** Tuesday, July 5, 2022 3:18 PM
**To:** Kaufmann, Daniel <dkaufmann@nvcc.edu>
**Cc:** Currie, Tammy H. <tcurrie@nvcc.edu>
**Subject:** RE: Human Resources - Investigation Meeting Request

I am represent by the Spriggle Law Firm and my lawyer would like to set up the meeting for tomorrow at 4:30.  I would like for it to be a zoom meeting. Can you send me a link and I can forward it to the lawyer.

## Joann Credle

Joann Credle, Ed.D., NCC, LPC
Coordinator of Specialized Programs
Northern Virginia Community College
CG 218
8333 Little River Turnpike
Annandale, VA 22003
(703) 323-3205
mailto:jcredle@nvcc.edu

**From:** Kaufmann, Daniel <dkaufmann@nvcc.edu>
**Sent:** Friday, July 1, 2022 10:19 AM
**To:** Credle, JoAnn O. <jcredle@nvcc.edu>
**Cc:** Currie, Tammy H. <tcurrie@nvcc.edu>
**Subject:** Human Resources - Investigation Meeting Request
**Importance:** High

Good Morning Dr. Credle,

I would like to schedule a mandatory confidential meeting with you to discuss your conduct from June 10, 2022.

Please confirm your availability on either **Tuesday, July 5th between 3:00pm – 4:30pm or Wednesday, July 6th from 2:30pm – 4:30pm.** Once confirmed we will send a meeting invite with the date, time and location of the meeting.

These meetings are confidential. During the meeting we will discuss or answer any questions you may have regarding this request. No preparation for this meeting is required.

As a general reminder, retaliation against any person who reports a situation or who is involved in a grievance or complaint, or a follow-up investigation is prohibited and will not be tolerated. Acts of retaliation should be reported to HR immediately and will be addressed in accordance with state and federal law.

We look forward to speaking with you.

Thank you,

**Daniel Kaufmann**
**Associate Director, Employee Relations**
**3926 Pender Dr. Suite 150, Fairfax, VA 22030**
**Phone: 703.503.6233**
**HR Main: 703.323.3110/ Fax: 703.323.3155**
dkaufmann@nvcc.edu/ www.nvcc.edu
employeerelations@nvcc.edu



*CONFIDENTIALITY NOTICE: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise be protected by law. Any access, use, disclosure or distribution of this email message by anyone other than the intended recipient(s) is unauthorized and prohibited. If you are not an intended recipient (or an agent acting on an intended recipient's behalf), please contact the sender by reply email and immediately destroy all copies of the original message. Virus scanning is recommended on all email attachments.*

ATTACHMENT #5

 **Northern Virginia Community College**

To:         Dr, JoAnn Credle, Coordinator of Specialized Programs
From:       Dr. Diane Mucci, Provost Annandale
CC:         Human Resources, Personnel File
Date:       July 11, 2022
Subject:    Letter of Reprimand – Misconduct

On June 10, 2022, in accordance with <u>VCCS Policy 3.12.3 Suspension</u>, you were suspended with pay pending the completion of an investigation by Human Resources due to your conduct on campus that day. Human Resources has completed its review and investigation and has determined that your behavior on June 10th violated <u>VCCS Policy 3.12 Faculty Sanctions</u>, <u>DHRM Policy 2.35 Civility in the Workplace</u>, and <u>DHRM Policy 1.60 Standards of Conduct</u>.

Specifically, the investigation found that on June 10th, you had several interactions with colleagues and co-workers on the Annandale Campus that were unprofessional and discourteous. These impromptu interactions included raising your voice and making inappropriate comments to coworkers and a community partner. These interactions were disruptive and inappropriate.

You explained that you were upset and hurt from being removed from a project on June 8, 2022, and that your behavior was the result of stress from this action. While you expressed sincerity in your explanation, and you were passionate about the project, it is the expectation of the College that employees act professionally at the workplace even when you disagree with an action or an individual. The College expects employees to work with one another professionally, even if they have had disagreements or issues previously. Concerns regarding other individual's behavior, or actions, should be escalated to the appropriate authority to address within the guidelines of VCCS, DHRM and NOVA.

Your behavior on June 10th undermined team cohesion and staff morale which is a violation of <u>DHRM Policy 2.35 Civility in the Workplace</u>, and <u>DHRM Policy 1.60 Standards of Conduct</u>. Furthermore, your actions did not align with the <u>VCCS Policy 3.12 Faculty Sanctions</u> and constituted misconduct. Per <u>VCCS policy 3.12.0(c)</u> misconduct includes an "unprofessional act occurring while working for or representing the institution or any such act while on the premises of the institution…" All employees are expected to conduct themselves in a manner that cultivates mutual respect, inclusion, and a healthy work environment.

Failure to address this behavior, including future instances of unprofessional behavior or incivility, may lead to additional formal disciplinary action up to and including dismissal. These actions will also be considered when evaluating your performance during your evaluation cycle.

This Letter of Reprimand will be placed in my supervisory file and in your HR personnel file. Please indicate below with your signature that you have received a copy of this Letter of Reprimand and it has been discussed with you.

_Refusal to sign -DK -7/11/22_ _____

Employee Signature                                          Date

_Diane Mucci_                          _7/11/22_

Supervisor Signature                                        Date
Attachments: VCCS Policy 3.12. Faculty Sanctions, DHRM Policy 2.35 Civility in the Workplace, and DHRM Policy 1.60 Standards of Conduct.

ATTACHMENT #6

**From:** Kress, Anne <akress@nvcc.edu>
**Sent:** Wednesday, May 4, 2022 10:57 AM
**To:** Credle, JoAnn O. <jcredle@nvcc.edu>
**Cc:** Calobrisi, Charlotte M. <ccalobrisi@nvcc.edu>; Gilmore, Herbertia <hgilmore@nvcc.edu>
**Subject:** Re: complaint

Dear Joann,

I am sorry that your interactions with Elizabeth Garibay and Ellen Fancher-Ruiz have not been positive.  I encourage you to make use of NOVA's policies for bringing forward such concerns if you feel they rise to the level of violating NOVA or VCCS policy. HR stands ready to assist.

Based on your allegation of improper practice during the search for the Annandale Campus and Community Outreach Coordinator, I have asked AVP Calobrisi to review that search process.

Sincerely,

Anne

_____

**Anne M. Kress, PhD**
President
*she/her/hers*

Brault Building
4001 Wakefield Chapel Road
Annandale, VA 22003

Office: 703.323.3101

CONFIDENTIALITY NOTICE: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise be protected by law. Any access, use, disclosure or distribution of this email message by anyone other than the intended recipient(s) is unauthorized and prohibited. If you are not an intended recipient (or an agent acting on an intended recipient's behalf), please contact the sender by reply email and immediately destroy all copies of the original message. Virus scanning is recommended on all email attachments.

**From:** Credle, JoAnn O. <jcredle@nvcc.edu>
**Date:** Monday, May 2, 2022 at 11:49 AM
**To:** Kress, Anne <akress@nvcc.edu>
**Cc:** Calobrisi, Charlotte M. <ccalobrisi@nvcc.edu>, Gilmore, Herbertia <hgilmore@nvcc.edu>
**Subject:** complaint

Dr. Kress:

I would like to talk to you about Ellen Fancher- Ruiz, she just hired another bully- Elisabeth Garibay.     Ms. Garibay is the Student Life Coordinator- at the time she was acting,  she would not give me a receipt for the money I was turning into her office and the major issue she told my BSA President that she could not help them, because I told her that she was taking over the club. Even if it was true, she should have never shared the information with the student.  the second concern and I had the student share his concern with Ellen, how she had an attitude with him.  Ellen asked the student if everything is okay- yes,  he was going to say, I can handle it.

Ellen is very manipulative and she has her staff to do her "dirt".   Before Dr. Hilbert left, Mathew McCall was complaining about Nigel Word getting the student life job, so Ellen talked to Dr. Hilbert they did interview, but he was not the best candidate.  Below is the email that Dr. Hilbert sent out to justify his qualification (this no Bob Hull).

Dear NOVA Annandale,

I am pleased to announce that our new Annandale Campus and Community Outreach Coordinator is Matthew "Tank" McCarl.

Tank has worked for NOVA the last 15 years in the Offices of Student Life at the Annandale and Woodbridge campuses, and has worked closely with faculty and staff across campuses to develop meaningful programs and supports for students and create relationship-building opportunities for the college community in general.  Tank is known for his good work with student ambassadors and other teams on team-building.  He has served on the state-wide planning team for the VCCS Student Leadership Conference, and was responsible for creating a Leadership Education and Development (LEAD) program for emerging student leaders, as well as a community service-learning program that opened doors for students to participate in and learn about their community in a meaningful way.
Tank has been involved in volunteer service with multiple community organizations, including Autism Speaks, The Wayne Foundation (an anti-human trafficking organization), and The Fairfax County Child ID Program.  He holds a B.A. in History from Catawba College and M.S. in Sport Studies from High Point University.

Please welcome Tank to his new role!

Pam


Yet, I complained and I am "ghosted"

I guess Annandale still see ask one of the Plantation Workers

ATTENTION:  This email originated from outside of Northern Virginia Community College. Do not click links or open attachments unless you recognize the sender and know the content is safe.



Joann Credle
Joann Credle, Ed.D., NCC, LPC
Coordinator of Specialized Programs
Northern Virginia Community College
CG 218
8333 Little River Turnpike
Annandale, VA 22003
(703) 323-3205
mailto:jcredle@nvcc.edu



ATTACHMENT #7



**DEPARTMENT OF HUMAN RESOURCE MANAGEMENT**

**POLICY 2.35 CIVILITY IN THE WORKPLACE**

**APPLICATION:**  All Executive Branch employees whether covered or non-covered under the Virginia Personnel Act. This includes all teaching, research and administrative faculty, employees of the Governor's Office, the Office of the Lieutenant Governor, and the Office of the Attorney General.

Expectations for appropriate behaviors extend to contract workers, customers, clients, students, volunteers, and other third parties in the workplace.

**PURPOSE:**
It is the policy of the Commonwealth to foster a culture that demonstrates the principles of civility, diversity, equity, and inclusion. In keeping with this commitment, workplace harassment (including sexual harassment), bullying (including cyber-bullying), and workplace violence of any kind are prohibited in state government agencies.

**POLICY SUMMARY:**
This policy is to ensure that agencies provide a welcoming, safe, and civil workplace for their employees, customers, clients, contract workers, volunteers, and other third parties and to increase awareness of all employees' responsibility to conduct themselves in a manner that cultivates mutual respect, inclusion, and a healthy work environment. All employees should receive training from either the agency EEO Officer or the Diversity, Equity, and Inclusion Unit in the Department of Human Resource Management to assist them in recognizing, preventing, and reporting behaviors that constitute harassment, sexual harassment, bullying, cyber-bullying, and threats or violence related to the workplace. Agencies are required to provide avenues for addressing complaints; to communicate how employees may access these procedures and participate in related investigations, free of retaliation; and to hold employees accountable for violations of this policy.

**AUTHORITY & INTERPRETATION:**
Title 2.2 of the Code of Virginia

The Director of the Department of Human Resource Management is responsible for official interpretation of this policy, in accordance with §2.2-1201 of the Code of Virginia.  The Department of Human Resource Management reserves the right to revise or eliminate this policy.

**RELATED POLICIES:**
Policy 1.60, Standards of Conduct
Policy 1.75, Use of Electronic Communications and Social Media
Policy 2.05, Equal Employment Opportunity

**POLICY HISTORY:**

| EFFECTIVE DATE | DESCRIPTION |
|---|---|
| 01-01-19 | Policy established.  This policy replaces Policy 1.80, Workplace Violence and Policy 2.30, Workplace Harassment. |
| 05-01-20 | Policy re-formatted, link for Policy Guide. |
| 07-01-20 | Policy revised per changes in Code of Virginia § 2.2-3901, 2.2-3903. |



**DEPARTMENT OF HUMAN RESOURCE MANAGEMENT**

**POLICY 2.35 CIVILITY IN THE WORKPLACE**

**ADMINISTRATIVE PROCEDURES**

## PROCEDURES

*Prohibited Conduct*

| General Provisions | Application |
|---|---|
| Harassment, Bullying, Workplace Violence<br><br>Refer to the Policy Guide on Prohibited Conduct/Behaviors for more information. | • The Commonwealth strictly forbids harassment (including sexual harassment), bullying behaviors, and threatening or violent behaviors of employees, applicants for employment, customers, clients, contract workers, volunteers, and other third parties in the workplace.<br>• Behaviors that undermine team cohesion, staff morale, individual self-worth, productivity, and safety are not acceptable. |
| Retaliation | The Commonwealth will not tolerate any form of retaliation directed against an employee or third party who, in good faith, either reports these prohibited behaviors or participates in any investigation concerning such behaviors. |

*Complaint Procedures*

| General Provisions | Application |
|---|---|
| Timely Reporting | Employees and third parties should report incidents of prohibited conduct as soon as possible after the incident occurs. |
| Recipient of Complaint | • Under no circumstances shall the individual alleging prohibited conduct be required to file a complaint directly with the individual(s) alleged to have engaged in the prohibited conduct.<br>• Under no circumstances shall the individual alleged to have engaged in prohibited conduct be allowed to investigate the complaint that he/she is alleged to have engaged in. |
| Assurance against Retaliation | • Employees and third parties who, in good faith, make complaints of inappropriate workplace conduct or provide information related to such complaints will be protected against retaliation.<br>• If retaliation occurs, the complainant(s) should report the retaliation through the appropriate complaint procedure. |
| Discriminatory Prohibited Conduct | Employees and applicants for employment seeking to remedy workplace harassment on the basis of an individual's race (to |

| General Provisions | Application |
|---|---|
|  | include traits historically associated with race including hair texture, hair type, and protective hairstyles such as braids, locks, and twists); sex; color; national origin; religion; sexual orientation; gender identity or expression; age; political affiliation; genetic information; veteran status; pregnancy, childbirth or related medical conditions; or disability may file a complaint using any of the options noted: |
|  | • **I**nternal Agency Procedure for Discriminatory Prohibited Conduct: The employee or applicant may report incidents of discriminatory harassment to his/her supervisor(s), the agency human resource director, the agency head, or any individual(s) designated by the agency to receive such reports; OR |
|  | • State Complaint Procedure for Discriminatory Prohibited Conduct: The employee or applicant may follow the complaint procedure as administered by the DHRM; OR |
|  | • Grievance Procedure for Discriminatory Prohibited Conduct: Eligible employees also may use the State Employee Grievance Procedure, which is administered by DHRM, to address discriminatory harassment; OR |
|  | • Federal Complaint Process for Discriminatory Prohibited Conduct:  Employees (and applicants for Commonwealth employment) may file a complaint with the U.S. Equal Employment Opportunity Commission. |
|  | • Those wishing to file a grievance may contact the Advice Line, administered by Office of Employee Dispute Resolution to discuss concerns and be advised of options and procedures. |
|  | • Those wishing to file a discriminatory complaint may contact the 800 number administered by the Diversity, Equity, and Inclusion Unit. |
| Non-Discriminatory Prohibited Conduct | • Employees and third parties who have been subjected to or have witnessed nondiscriminatory prohibited conduct may report the incident(s) to their supervisor(s), the agency human resource director, the agency head, or any individual(s) designated by the agency to receive such reports. |
|  | • Each agency shall communicate its internal procedure to employees and respond to third parties accordingly. |
|  | • The procedure shall ensure the safety and anonymity of those reporting threats or violent situations and shall include a mechanism to address such situations immediately. |
|  | • This may include prompt notification of appropriate law enforcement or medical authorities. |

### *Policy Violations*

| General Provisions | Application |
|---|---|
| Engaging In Prohibited Conduct: | Any employee who engages in conduct prohibited under this policy or who encourages or ignores such conduct by others shall be subject to corrective action, up to and including termination, under Policy 1.60, Standards of Conduct. |
| Allowing Prohibited Conduct to Continue | Managers and/or supervisors who allow observed or reported prohibited conduct addressed in this policy to continue upon becoming aware of the behavior may be considered parties to the offense and subject to disciplinary action, up to and including termination, under Policy 1.60, Standards of Conduct. |
| Failure to Respond | Managers and/or supervisors who fail to take appropriate action upon becoming aware of the behavior shall be subject to disciplinary action, up to and including termination, under Policy 1.60, Standards of Conduct. |
| Violations Outside the Workplace | • Violations occurring outside the workplace may be grounds for disciplinary actions, up to and including termination.<br>• In these situations, the agency must demonstrate that the conduct committed has a sufficient nexus to the workplace or the agency's operations, services, or reputation to be addressed by this policy. |

### *Agency Responsibilities*

| General Provisions | Application |
|---|---|
| Complaint Procedures | Agencies must establish internal complaint procedures, designate recipients of such complaints, and assign responsibilities for investigation and communication of findings. |
| Safety Protocols | Agencies must establish and communicate protocols for assessing and addressing emergency situations involving threatening or violent behaviors. |
| Communication | Agencies must communicate this policy to employees and third parties on a periodic basis. Communication must include:<br>• The agency's commitment to providing a safe work environment; to fostering a culture of civility, diversity, and equity inclusion.; and to immediately addressing prohibited conduct.<br>• The requirement that employees participate in training on the Civility in the Workplace policy and about the types of behavior that are considered prohibited conduct.<br>• Directions and procedures established for filing related complaints. Complaint procedures shall be communicated periodically and through multiple media to ensure that employees are aware of their right to report prohibited conduct and are assured that there will be no retaliation for doing so. |
|  |  |

| General Provisions | Application |
|---|---|
| Agency Management | Agency managers and supervisors are required to:<br>• Stop any prohibited conduct of which they are aware, whether or not a complaint has been made.<br>• Express strong disapproval of all forms of prohibited conduct.<br>• Intervene when they observe any acts that may be considered prohibited conduct.<br>• Take immediate action to prevent retaliation towards the reporting party or any participant in an investigation.<br>• Take immediate action to eliminate any hostile work environment when there has been a complaint of workplace harassment.<br>• Take immediate action to address any threats or violent behavior that could endanger the safety of employees and others in the workplace or result in damage to physical structures. |
| Contract Workers/Other Third Parties | Agencies must ensure that contract workers or other third parties are made aware of this policy and are provided with related training. |

### *Department of Human Resource Management Responsibilities*

| General Provisions | Application |
|---|---|
| DHRM Responsibilities | • Provide online training coursework related to this policy to be accessible to employees.<br>• Provide policy and training guidance to agencies.<br>• Communicate to agency heads and human resource directors the requirement that all employees complete the online training provided by DHRM or comparable training provided by the agency. |

## GLOSSARY

Bullying — Disrespectful, intimidating, aggressive and unwanted behavior toward a person that is intended to force the person to do what one wants, or to denigrate or marginalize the targeted person. The behavior may involve a real or perceived power imbalance between the aggressor and the targeted person. The behavior typically is severe or pervasive and persistent, creating a hostile work environment. Behaviors may be discriminatory if they are predicated on the targeted person's protected class (e.g., using prejudicial stereotyping or references based on the targeted person's characteristics or affiliation with a group, class, or category to which that person belongs, or targeting people because they are in a protected class).

| | |
|---|---|
| Cyber-Bullying | Using technology to intentionally harm others through hostile behavior, threatening, disrespectful, demeaning, or intimidating messages. Bullying that occurs via the Internet, cell phones, or other devices (e-mails, IMs, text messages, blogs, pictures, videos, postings on social media, etc.). Pretending to be the victim or spreading rumors or visual images online in order to denigrate or marginalize the targeted person. Behaviors may be discriminatory if they are predicated on the targeted person's protected class (e.g., using prejudicial stereotyping or references based on the targeted person's characteristics or affiliation with a group, class, or category to which that person belongs, or targeting people because they are in a protected class). |

Discriminatory Workplace Harassment [Harassment Illegal under Equal Employment Laws]

Discriminatory Harassment
Any unwelcome verbal, written or physical conduct that either denigrates or shows hostility or aversion towards a person on the basis of race; traits historically associated with race including hair texture, hair type, and protective hairstyles such as braids, locks, and twists; sex; color; national origin; genetic information; religion; sexual orientation; gender identity or expression; age; political affiliation; veteran status; pregnancy, childbirth or related medical conditions; or disabilities, that: (1) has the purpose or effect of creating an intimidating, hostile or offensive work environment; (2) has the purpose or effect of unreasonably interfering with an employee's work performance; or (3) affects an employee's employment opportunities or compensation.

Sexual Harassment
Any unwelcome sexual advance, request for sexual favors, or verbal, written or physical conduct of a sexual nature by a manager, supervisor, co-workers or non-employee (third party).

Quid pro quo
A form of sexual harassment by a manager/supervisor or a person of authority in which an employee's receipt of a job benefit or the imposition of a tangible job detriment is conditioned on the employee's acceptance or rejection of the harassment.

Hostile work environment
A form of sexual harassment when a victim is subjected to unwelcome and severe or pervasive repeated sexual comments, innuendos, touching, or other conduct of a sexual nature that creates an intimidating or offensive place for the employees to work.

Non-Discriminatory Workplace Harassment [Harassment not Based on Protected Classes]

Any targeted or directed unwelcome verbal, written, social, or physical conduct that either denigrates or shows hostility or aversion towards a person not predicated on the person's protected class.

| | |
|---|---|
| Retaliation | Overt or covert acts of reprisal, interference, restraint, penalty, discrimination, intimidation, or harassment against an individual or group exercising rights under this policy. |
| Third Parties | Individuals who are not state employees, but who have business interactions with state employees. Such individuals include, but are not limited to: |

- Customers;
- Clients;
- Students;
- Interns;
- Vendors;
- Contractors;
- Volunteers;
- Applicants for state employment or services; and the
- General public.

| | |
|---|---|
| Workplace | Any location, either permanent or temporary, where an employee performs any work-related duty or is representing the agency in this capacity. This includes, but is not limited to, the buildings and surrounding perimeters, including the parking lots, field locations, alternate work locations, clients' homes or offices, outside meetings, conferences and conventions, and travel to and from work assignments. It also applies to written, verbal, or graphic communications delivered in person, via phone, message, computer, or social media. |
| Workplace Violence | Any physical assault, threatening behavior, or verbal abuse occurring in the workplace by employees or third parties. Threatening behaviors create a reasonable fear of injury to another person or damage to property or subject another individual to extreme emotional distress. |

ATTACHMENT #8



**DEPARTMENT OF HUMAN RESOURCE MANAGEMENT**

**POLICY 1.60 STANDARDS OF CONDUCT**

**APPLICATION:**  Full-time, Quasi Full-time, and Part-time non-probationary classified employees. *Note:  Agencies may use this policy as a guide for evaluating the workplace conduct of employees who are not covered by the Virginia Personnel Act, such as wage employees, probationary employees and employees expressly excluded from the application of policy. Official Written Notice forms may not be issued to these employees.*

**PURPOSE:**
It is the policy of the Commonwealth to promote the well-being of its employees by maintaining high standards of work performance and professional conduct with an overall emphasis on diversity, equity and inclusion that promotes equitable treatment of all employees.

**POLICY SUMMARY:**
This policy sets forth the Commonwealth's Standards of Conduct and the disciplinary process that agencies must utilize to address unacceptable behavior, conduct, and related employment problems in the workplace or outside the workplace when conduct impacts an employee's ability to do their job and/or influences the agency's overall effectiveness.

**AUTHORITY & INTERPRETATION:**
Title 2.2 of the Code of Virginia

The Director of the Department of Human Resource Management is responsible for official interpretation of this policy, in accordance with §2.2-1201 of the Code of Virginia.  The Department of Human Resource Management reserves the right to revise or eliminate this policy.

**RELATED POLICIES:**
All DHRM issued policies
Related Agency policies

**POLICY HISTORY:**

| EFFECTIVE DATE | DESCRIPTION |
|---|---|
| 04-16-08 | Policy published. |
| 06-01-11 | Policy revised. |
| 01-10-12 | Policy corrected to note that campus police departments of any public institution of higher education of the Commonwealth where such department, bureau or force has ten or more law-enforcement officers also have access to the procedural guidelines of Va. Code § 9.1-500 – 507 in cases of investigation of work-related matters that could lead to the dismissal, demotion, suspension or transfer for punitive reasons of a law-enforcement officer. |
| 03-07-22 | Policy reformatted and revised.  Addition of Policy Guidance Documents. |

**PROCEDURES**

*Shortcuts to Sections*

General Principles

Employee Standards of Conduct

Corrective and Disciplinary Action

Due Process

Pre-disciplinary Leave With or Without Pay

Disciplinary Suspension

Removal Due to Circumstances which Prevent Employees from Performing their Jobs

Use of Grievance Procedure

Records Management

Glossary

*General Principles*

| General Provisions | Application |
|---|---|
| Guidelines | • The intent of this policy and its procedures is to help employees become fully contributing members of the organization. This policy enables agencies to administer corrective actions or discipline to improve performance or conduct or terminate employees whose conduct and/or performance does not improve.<br>• Agencies are encouraged to follow a course of progressive and situationally appropriate discipline that objectively and consistently addresses employee behavior, conduct, or performance that is incompatible with the state's Standards of Conduct, agency expectations for employees, and/or related agency policies.<br>    ○ NOTE:  Non-probationary law enforcement officers employed by the Department of State Police, the Virginia Marine Resources Commission, the Department of Wildlife Resources, the Department of Conservation and Recreation, the Department of Motor Vehicles, the Department of Corrections and the campus police department of any public institution of higher education of the Commonwealth where such department, bureau or force has ten or more law-enforcement officers also have access to the procedural guidelines of the Code of Virginia § 9.1-500 |

| General Provisions | Application |
|---|---|
| | – 507 and § 9.1-508 – 512 respectively in cases of investigation of work-related matters that could lead to the dismissal, demotion, suspension or transfer for punitive reasons of a law enforcement officer.<br><br>• Corrective or disciplinary actions must be administered through an objective process initiated as promptly as feasible.<br><br>• There may be circumstances when an employee's conduct requires immediate disciplinary action without employing progressive discipline. If the misconduct and/or unacceptable performance is of an especially serious nature, a first offense may warrant significant discipline, including termination. Agencies must provide notice of intent and give the employee an opportunity to respond. Then the agency must document the nature of the offense and the reason for taking disciplinary measures via a Written Notice.<br><br>• Management should apply corrective or disciplinary actions consistently and in an objective and equitable manner, while taking into consideration the specific circumstances of each individual case. Prior to taking such action, management must consider the following:<br><br>   o Whether the corrective or disciplinary action is consistent with state and agency standards of conduct.<br>   o The nature, severity, and consequences of the offense.<br>   o Whether the offense constitutes a violation of a policy, procedure, rule, or law.<br>   o Previous counseling, whether verbal or written, that addressed the same or similar misconduct or performance.<br>   o Previous disciplinary actions that addressed the same or similar misconduct or performance.<br>   o Whether the offense relates to the employee's job duties and the employee's ability to perform satisfactorily.<br>   o How issues with similarly situated employees have been addressed.<br>   o Mitigating factors that would compel a reduction in the disciplinary action to promote the interests of fairness, equity and objectivity.<br>   o Whether the corrective or disciplinary action is appropriate for a specific offense.<br><br>• Before the need for, or in addition to corrective counseling or disciplinary action, management may refer employees to |

| General Provisions | Application |
|---|---|
| | the Employee Assistance Program (EAP) or other professional assistance program as appropriate to encourage employees to address their needs in support of work performance or conduct improvement.  Referrals to the EAP or comparable program shall not be considered a substitute for any disciplinary action imposed for the commission of an offense.<br><br>NOTE:  Mandated referrals to the EAP or comparable program may be required depending upon the nature of the behavior or misconduct.  Agencies are advised to consult with their agency's Assistant Attorney General prior to mandating participation in such programs. |

### *Employee Standards of Conduct*

| General Provisions | Application |
|---|---|
| Expectations of Conduct for Employees | Agencies have the authority to supplement the list below as needed in a manner consistent with the needs of the organization and intent of this policy. The following list is not all-inclusive but is intended to illustrate the minimum expectations for acceptable workplace conduct and performance.<br><br>• Report to work as scheduled and seek approval from the supervisor in advance for any changes to the established work schedule, including the use of leave and late or early arrivals and departures.<br>• Perform assigned duties and responsibilities with the highest degree of public trust.<br>• Devote full effort to job responsibilities during work hours.<br>• Maintain the qualifications, certification, licensure, and/or training requirements identified for their positions.<br>• Demonstrate respect for the agency and toward agency coworkers, supervisors, managers, subordinates, residential clients, students, and customers.<br>• Use state equipment, time, and resources judiciously and as authorized.<br>• Support efforts that ensure a safe and healthy work environment.<br>• Utilize leave and related employee benefits in the manner for which they are intended.<br>• Resolve work-related issues and disputes in a professional manner and through established business processes.<br>• Meet or exceed established job performance expectations. |

| General Provisions | Application |
|---|---|
| | • Make work-related decisions and/or take actions that are in the best interest of the agency.<br>• Comply with the letter and spirit of all state and agency policies and procedures, the Conflict of Interest Act, and Commonwealth laws and regulations.<br>• Report circumstances or concerns that may affect satisfactory work performance to management, including any inappropriate activities (such as fraudulent, illegal, unethical or discriminatory actions) of other employees.<br>• Obtain approval from supervisor prior to accepting, initiating, or continuing outside employment.<br>• Obtain approval from supervisor prior to working overtime, if non-exempt from the Fair Labor Standards Act (FLSA).<br>• Work cooperatively to achieve work unit and agency goals and objectives.<br>• Conduct themselves at all times in a manner that supports the mission of their agency and the performance of their duties. |
| Expectations for Supervisors and Managers | Supervisors and managers are expected to serve as role models through their compliance with policies, agency protocols and best practices in leading and communicating with their subordinate employees. Expectations for supervisors, and managers include but are not limited to:<br><br>• Demonstrate interpersonal communications, leadership strategies and personal conduct that fosters a respectful workplace culture and models the expectations established for employees;<br>• Provide consistent and objective feedback, coaching and instructional guidance to employees regarding their performance, conduct or compliance with policies and procedures prior to initiating corrective or formal actions;<br>• Document verbal counseling and retain corrective written counseling in confidential supervisory files;<br>• Ensure the confidentiality of employee performance and disciplinary actions and related documentation.<br>• Establish on-boarding and periodic communications with subordinates to inform them of policies, protocols, and expectations specific to job duties;<br>• Seek guidance from Human Resources prior to administering disciplinary actions or removing employees from the workplace.  This includes the responsibility to communicate any job-related criminal charges and convictions to Human |

| General Provisions | Application |
|---|---|
| | Resources; |
| | • Under the guidance of Human Resources, participate collaboratively in pre-disciplinary investigations or disciplinary reviews to include identifying or disclosing relevant documentation and witnesses or parties to the incident(s) of concern; |
| | • Participate in periodic training/education on the Standards of Conduct policy and best practices. |

***Corrective Actions***

| General Provisions | Application |
|---|---|
| Counseling | • Counseling is provided by a supervisor or manager in the employee's reporting structure and is typically the first level of corrective action but is not a required precursor to the issuance of Written Notices.  Counseling may be verbal or written communication which conveys that an employee's conduct or performance was improper and must be corrected. |
| | • Counseling is appropriate for conduct and/or performance issues resulting in minimal impact to business operations or that involve minor infractions of policies or laws. |
| | • Documentation regarding counseling should be retained in the supervisor's files, and not in the employee's official personnel file maintained by the Agency's Human Resources office, except as necessary to support subsequent formal disciplinary action or a Below Contributor performance rating as part of the annual performance review.  A copy must be provided to the employee. |
| | • Legal counsel shall not attend counseling sessions. |
| Verbal Counseling | • Verbal counseling should consist of private, confidential discussions between employees and their supervisors regarding the desired course of action to improve the employees' performance and/or conduct, and what may occur if the performance or conduct is not corrected. |
| | • The supervisor should explain that a summary of the conversation will be noted and placed in the supervisory file. |
| Written Counseling | • A written memorandum or Notice of Improvement Needed/Substandard Performance form should be issued to emphasize the significance of relatively minor acts of |

| General Provisions | Application |
|---|---|
|  | misconduct or unacceptable performance when facts and discussions with the employee demonstrate that verbal counseling has not corrected the problem. It may also be issued as the initial means to address first instances of misconduct or unsatisfactory performance.<br>● Written counseling must be documented by a letter, memorandum, electronic communication or Notice of Improvement Needed/Substandard Performance form. It should not be documented via the Written Notice form. |

### *Disciplinary Actions*

| Formal Written Notices<br><br>Refer to Attachment A: Examples of Offenses Grouped by Level for additional information.<br><br>Refer to the Disciplinary Meeting Reference Guide for additional information. | ● When counseling has failed to correct misconduct or performance problems, or when an employee commits a more serious offense, management should address the matter by issuing a Written Notice.<br>● A Written Notice may be accompanied by additional actions including suspension; a demotion or transfer with reduced responsibilities with a disciplinary salary action; a transfer to an equivalent position in a different work area; or termination.<br>● Management should issue Written Notices as promptly as feasible upon becoming aware of misconduct or unacceptable performance.  (Refer to the Due Process section of this policy).<br>● The Written Notice Form  must include an advisory statement that an active Written Notice may affect the employee's overall annual performance evaluation rating.<br><br>To assist management in the assessment of the appropriate action, offenses are organized into three groups (Group I, Group II, and Group III) according to the severity of the misconduct or behavior.<br><br>● Examples of offenses, by group, are presented in Attachment A – Examples of Offenses Grouped by Level.<br>● The offenses listed in Attachment A are not all-inclusive, but are intended as examples of conduct for which specific corrective or disciplinary actions may be warranted.<br>● Agencies may address multiple offenses through the issuance of one or more Written Notices.<br>● Accordingly, any offense not specifically enumerated, that in the judgment of agency heads or their designees undermines the effectiveness of agencies' activities, may be considered unacceptable and treated in a manner consistent with the provisions of this section. |

| | |
|---|---|
| | • An employee's legal counsel may not attend or participate in internal discussions or investigative meetings to determine the facts or if violations have occurred.<br><br>NOTE:  Under certain circumstances, an offense typically associated with one offense category may be elevated to a higher-level offense.  Agencies may consider any unique impact that a particular offense has on the agency and the fact that the potential consequences of the performance or misconduct substantially exceed agency norms. |
| Group I Offense | • Offenses in this category include acts of minor misconduct that require formal disciplinary action.  This level is appropriate for repeated acts of minor misconduct or for first offenses that have a relatively minor impact on business operations but still require formal intervention.  See attachment A for examples of Group I Offenses and the effects on accumulation or repeat offenses.<br><br>**Active Life of Notices**<br>• Two years from the date of issuance to the employee.<br><br>**Suspension Options**<br>• No suspension for a first offense, but a third active Group I Notice may result in a suspension of up to ten workdays (or a maximum of 80 hours for non-exempt employees).  Refer to the Disciplinary Suspension section of this policy for guidance on the suspension of exempt employees. |
| Group II Offense | Offenses in this category include acts of misconduct of a more serious and/or repeat nature that require formal disciplinary action. This level is appropriate for offenses that seriously impact business operations and/or constitute neglect of duty involving major consequences, insubordinate behaviors and abuse of state resources, violations of policies, procedures, or laws. See attachment A for examples of Group II Offenses and the effect on accumulation.<br><br>**Active Life of Notices**<br>• Three years from the date of issuance to the employee.<br><br>**Suspension Options**<br>• Suspension of up to 10 workdays (or maximum of 80 hours for non-exempt employees) for the first Group II Offense.  Refer to the Disciplinary Suspension section of this policy for guidance on suspensions for exempt employees. |
| Group III Offense | Offenses in this category include acts of misconduct of such a severe nature that a first occurrence normally should warrant termination.  This level is appropriate for offenses that, for example, endanger others in the workplace, constitute illegal or |

| | |
|---|---|
| | unethical conduct; indicate significant neglect of duty; result in disruption of the workplace; or other serious violations of policies, procedures, or laws.  See attachment A for examples of Group III Offenses.<br><br>**Active Life of Notices**<br>● Four years from the date of issuance to the employee.<br><br>**Suspension Options**<br>● Suspension of up to 30 workdays (or maximum of 240 hours for non-exempt employees).  Refer to the Disciplinary Suspension section of this policy for guidance on suspensions for exempt employees.<br><br>**Considerations for Group III Offenses**<br>● One Group III Offense normally should result in termination unless there are mitigating circumstances.<br>● Mitigating circumstances for a Group III offense may support, as an alternative to termination, an employee's demotion or transfer to a position with reduced responsibilities or removal of responsibilities and a disciplinary salary action with a minimum 5% reduction in salary; transfer to an equivalent position in a different work area; and/or suspension of up to 30 workdays.<br>● An employee who is issued a Written Notice that would normally warrant termination but who is not terminated due to mitigating circumstances should be notified that any subsequent Written Notice for any level offense during the active life of the Written Notice may result in termination.<br>● If an agency permits an employee to resign in lieu of termination, this transaction should be recorded in the human resource system of record as a resignation in lieu of termination. |
| Active Life of Written Notices | The active life of Written Notices as stated above are definite and may not be extended due to an employee's absence.  Notices expire when an employee voluntarily or involuntarily separates provided that re-employment with the same or different agency occurs after a formal break in service and a new probationary period is required. |
| Mitigating Circumstances and Aggravating Factors | ● Agencies may reduce the level of a disciplinary action if there are mitigating circumstances, such as conditions that compel a reduction to promote the interests of consistency, equity and objectivity, or based on an employee's otherwise satisfactory work performance.<br>● Aggravating Factors may support a higher-level offense when the facts and circumstances associated with the employee's actions negatively impact the employee's credibility as a supervisor/manager of subordinates, reveals a serious disregard for the safety and well-being of self or others, or damages the credibility and reputation of the agency.  Repeat |

Page 9

| | infractions of the same or significantly similar offense may also be considered an aggravating factor. |
|---|---|

### Notice of Intent (Due Process)

| General Provision | Application |
|---|---|
| Advance Notice of Potential Discipline to Employees | • Prior to the issuance of Written Notices, employees must be given oral or written notification of the offense, an explanation of the agency's evidence in support of the charge, and a reasonable opportunity to respond. |
| Employee's "Reasonable Opportunity to Respond" | • Employees must be given a reasonable opportunity to respond after receiving notification of potential disciplinary actions.  Typically, a 24-hour period is a sufficient period of time, however, a "reasonable opportunity to respond" should not be based solely on the quantity of time provided but also on the nature of the offense, the time period over which alleged events occurred, and the volume of evidence that may be presented. Based on this assessment more or less time may be granted to refute the allegations.<br>• The employee's response may be written or provided to management during a virtual, telephonic or face to face meeting.<br>• Legal counsel may not attend or participate in the agency's internal due process meetings.  Agency staff in attendance may include the appropriate supervisor or manager within the employee's reporting structure.  A representative of Human Resources may also attend.<br>• An employee on paid or unpaid leave may receive a notice of intent and the agency may proceed with the expectation for the employee to respond.  However, agencies are encouraged to be mindful of the employee's current circumstances and availability to respond. |
| Human Resource Director's review of disciplinary actions<br><br>Refer to the Due Process Reference Guide for additional information. | Prior to the issuance of any Written Notices, demotions, transfers with disciplinary salary actions, suspensions or terminations, Agency Human Resource Directors or their designees must review the documentation for the recommended actions to determine:<br>• If the action is appropriate for the offense and if the documentation supports the selected level of action;<br>• If a referral to the employee assistance program is advisable; |

| General Provision | Application |
|---|---|
| | • If there is evidence that warrants mitigation of the disciplinary actions, and<br>• What the final recommendation for corrective action should be to ensure consistency, equity and objectivity. |

**Pre-disciplinary Leave or Suspensions Pending Reviews or Investigations**

| General Provisions | Application |
|---|---|
| Removal from the Workplace | Contingent upon the circumstances, management may immediately remove an employee from the workplace or instruct the employee to cease performing work or representing the agency in business matters when the employee's continued presence:<br>• May be harmful to the employee, other employees, clients, and/or patients/residents;<br>• Hinders the agency's ability to conduct business operations;<br>• May hamper or interfere with an internal agency disciplinary review or pre-disciplinary investigation regarding the employee's alleged misconduct;<br>• May hamper or interfere with an external investigation conducted by law enforcement for alleged criminal charges that are relevant to the employee's performance of assigned job duties; and/or<br>• May constitute negligence in regards to the agency's duties to the public and/or other employees.<br><br>Following the employee's removal from the work area for reasons stated above, management must provide a notice of intent of potential disciplinary action as promptly as feasible.<br><br>Written notification of pre-disciplinary leave with pay pending a disciplinary review or agency pre-disciplinary investigation shall be by memorandum, not communicated via the Written Notice form.<br><br>Contingent with the circumstances and in consultation with Human Resources, agency management may temporarily reassign an employee to a vacant position in the same pay band, temporarily remove and reassign job duties at the same pay level, or permit the employee to telework as appropriate. |

| General Provisions | Application |
|---|---|
| | Provide the employee specific instructions in writing prohibiting potential interference with the ongoing investigation to include refraining from discussing the matter with other employees.  Such discussions shall be limited to Human Resources or the employee's supervisor or managers within their reporting structure. |
| Removal for Disciplinary Reviews or Pre-disciplinary Investigations | Employees may be placed on paid pre-disciplinary leave for up to fifteen workdays (maximum of 120 hours for non-exempt employees).<br><br>If the disciplinary review or pre-disciplinary investigation is not completed within fifteen workdays or 120 hours the agency must:<br>● Impose disciplinary action in accordance with this policy;<br>● Permit the employee to return to work to include remote work or a temporary reassignment pending the outcome of the review or investigation; or<br>● Extend pre-disciplinary leave with pay for a specified period of time as determined by the agency head; and<br>● Advise the employee of the action in writing. |
| Removal from the Workplace for Criminal Charges | Management may also immediately remove an employee from the workplace without providing advance notification when the employee is under investigation for alleged criminal conduct that is impactful to the employee's performance of job duties or to the agency's critical mission activities.  Contingent with the circumstances of the criminal charges, reassignment may occur if the agency can identify a placement that does not jeopardize the investigation or create liability for the Commonwealth.<br><br>**Suspension without Pay due to Alleged Criminal Conduct**<br><br>● Any employee who is formally charged with a criminal offense that impacts their ability to do their job or represents a risk to the agency and to the agency's mission shall be immediately suspended without pay for a period not to exceed ninety calendar days or temporarily reassigned to a position that is not impacted by the criminal charges.<br>● Agencies have the option to allow employees to charge accrued annual leave to this period of suspension provided that the employee has sufficient leave balances.<br>● If, at the conclusion of the ninety-day period of suspension without pay there has been no resolution of the criminal charge, the employee will be placed on or returned to pre-disciplinary leave with pay until the charge has been resolved. |

| General Provisions | Application |
|---|---|
| | • If the criminal investigation is concluded without a formal indictment, or if the charge is resolved without the employee being convicted, the employer shall return the employee to active status. |
| | • Any accrued annual leave applied to the period of suspension without pay for pending criminal charges shall be reinstated provided the leave was not carried over into the new Leave Year on January 10th.  This includes the reinstatement of missed annual leave accruals. |
| | • Regardless of the status of any criminal investigation, process, or outcome, the agency may determine at any time to notify the employee of disciplinary charges and administer formal disciplinary actions up to and including termination, based upon the facts or evidence of conduct that prompted the criminal investigation or process. |
| | • See the Policy Guidance document Impact of Suspension on Pay and Benefits |
| Impact of Felony Convictions for Misconduct Associated with Performance of Job Duties | In accordance with § 51.1-124.13, when an employee is convicted of a felony for misconduct associated with the performance of job duties, a forfeiture of all VRS-related benefits will occur.

• Prior to making such a determination, the agency must provide the employee with a written notice and provide a reasonable opportunity for the employee to be heard during the agency's review process. The employee's response may be written or heard orally via a virtual or in person meeting.
• Upon consideration of the employee's response and the relevant criteria associated with the felony, the agency shall notify the employee in writing of a determination which shall also include the employee's option to appeal.
• Within five calendar days of the receipt of the determination, the employee may submit a written appeal of the agency's determination sent to the Agency Head or designee.
• Within five working days of receiving an employee's appeal of the determination, the agency shall transmit a copy of the record to the clerk of the circuit court in the jurisdiction where the employer is located.
• If a timely appeal is not filed by the employee, the Agency's determination becomes final ten calendar days after the agency's determination. |

| General Provisions | Application |
|---|---|
| | • Within thirty days of the receipt of the record, the court shall hear the appeal and evidence that is necessary to resolve any controversy as to the correctness of the record and at its discretion, may hear other relevant evidence. The circuit court hearing shall be at no cost to the Agency or the employee per § 51.1-124.13. <br> • The court may affirm, reverse or modify the Agency's determination.  The decision of the court shall be rendered within fifteen days from the date of the hearing's conclusion.  The court's decision shall be considered final and is not subject to appeal. <br><br> Upon a final determination that the felony conviction is associated with the employee's job, Human Resources must submit a completed VRS-180 (Employer Request for Forfeiture of Member Benefits) to the VRS.  The VRS-180 provides detailed descriptions of the forfeiture and appeals processes as well as which VRS benefits are affected by the request. <br><br> Direct the employee to the Virginia Retirement System (VRS) to determine their eligibility for a full or partial refund of employee contributions and interest based on vesting requirements for refunds as established by the VRS policies. |

**Disciplinary Suspension**

| General Provisions | Application |
|---|---|
| Disciplinary Suspensions | • All disciplinary suspensions represent a Leave without Pay or pay docking transaction. <br> • Employees on suspension normally shall not be allowed on the agency's premises, nor shall they be allowed to work except to fulfill previously scheduled court obligations or to file and process a grievance or Equal Employment Opportunity complaint. <br> • The maximum periods of suspensions are described in Attachment A – Examples of Offenses Grouped by Level. |
| Suspension of Employees **Exempt** from the Fair Labor Standards Act | **Exempt** employees' salaries may not be reduced as the result of a suspension except as described in this section.  Exempt employees should be reimbursed promptly for any disciplinary salary reductions that are non-compliant. <br><br> NOTE: Although probationary employees are not covered by this policy, the FLSA rules for suspension are applicable. |

| General Provisions | Application |
|---|---|
| | **Suspension for Infraction of a Safety Rule**<br>● Disciplinary suspension of an exempt employee for an infraction of a safety rule of major significance may be applied for less than a full workday or workweek.<br>● Safety rules of major significance are defined as provisions intended to prevent serious danger to the workplace or to other employees.<br><br>**Suspension for Misconduct**<br>● If an exempt employee is suspended for misconduct, the suspension shall not be less than a full workday.<br>● Suspensions of more than one workday must be in multiples of full workdays, e.g., a three-day (24 hour) suspension for an employee assigned to 8-hour workdays, or a three-day (30 hour) suspension for an employee assigned to 10-hour workdays.<br>● If it becomes necessary to remove an exempt employee from the workplace for a partial workday due to the employee's misconduct, the employee must be paid for that partial day's absence.<br><br>**Suspension for Unsatisfactory Attendance or Non-Conduct related Performance Issues**<br>● If an exempt employee is suspended for disciplinary reasons related to the employee's unsatisfactory attendance or performance issues (non-conduct related) the suspension shall not be less than a full workweek.<br>● Suspensions of more than one workweek will be in multiples of full workweeks, e.g., a three-week (120-hour) suspension.  An employee may not be permitted to serve a suspension related to attendance or performance other than in whole workweek segments.<br>● Less serious violations in these areas should be addressed by other means of discipline, reserving suspension for the most serious or repeated violations.<br><br>**Suspension Pending Outcome of a Criminal Investigation**<br>● If an exempt employee is suspended pending the outcome of a criminal investigation, the employee must be paid for any partial work week suspensions.<br>● Full workweeks of suspension are unpaid.  See the Policy Guidance document Impact of Suspension on Pay and Benefits |

***Removal Due to Circumstances which Prevent Employees from Performing their Jobs***

| General Provisions | Application |
|---|---|
| Inability to meet working conditions | An employee unable to meet the working conditions of their employment due to circumstances such as those listed below may be removed under this section.  Reasons include but are not limited to:<br><br>• Loss, suspension or restrictions of driver's license that is required for performance of the job;<br>• Incarceration for any period that is disruptive to agency business operations;<br>• Failure to obtain or retain license, certification, or other credentialing required for the job;<br>• Inability to perform the essential functions of the job after reasonable accommodation (if required) has been discussed, applied and alternative accommodations will result in undue hardship;<br>• Failure to successfully pass an agency's background investigation;<br>• Conviction of a misdemeanor crime of domestic violence for employees whose jobs require: a) carrying a firearm; or b) authorization to carry a firearm; or<br>• Conviction of barrier crimes that impact the employee's ability to perform assigned job duties;<br>• Failure to timely present appropriate documentation of identity and eligibility to work in the U.S. as required by federal law to include expiration of prior visa.<br><br>Prior to such removal, the appointing authority and/or Human Resource Office shall gather full documentation supporting such action and issue a notice of intent to the employee, verbally or in writing, of the reasons for such a removal, giving the employee a reasonable opportunity to respond.<br><br>Final notification of removal should be via memorandum or letter, not by a Written Notice form.<br><br>Employees may challenge removals through the Employee Grievance Procedure, and may direct questions regarding this procedure to the DHRM Office of Employment Dispute Resolution.<br><br>Agencies may, based on mitigating circumstances, demote or transfer and reduce the employee's duties with a minimum 5% reduction in salary, or transfer them to an equivalent position |

| General Provisions | Application |
|---|---|
| | without a reduction in salary as an alternative to termination based upon availability of funded positions and agency business need. |
| Terminations<br><br>. | Refer to Policy 1.70, Termination/Separation from State Service for additional information on the disposition of leave and other benefits upon separation from state service.<br>Refer to the Terminations Reference Guide for additional information |

***Use of Grievance Procedure***

| General Provisions | Application |
|---|---|
| Classified Non-Probationary Employees | Classified, non-probationary employees may challenge corrective or disciplinary actions through the Employee Grievance Procedure, and may direct questions regarding this procedure to the Department of Human Resource Management's Office of Employment Dispute Resolution. |
| Hearing Officer's Authority | A hearing officer may uphold, reduce or rescind corrective or disciplinary actions taken by an agency so long as the officer's decision is consistent with written policy. See the Grievance Procedure Manual for a full understanding of Hearing Officer's Authority.<br><br>**Reinstatement by a Hearing Officer**<br><br>When a hearing officer orders an employee's reinstatement from suspension or termination the hearing officer may order:<br><br>● Full, partial, or no back pay;<br>● A reduction in the employee's disciplinary record such that termination no longer could take place (e.g., the employee has only three Group I Written Notices or one Group II Written Notice); or the officer must reinstate the employee with full back pay minus an appropriate disciplinary suspension;<br>● Adjustments to accrued leave; or<br>● Reimbursements for health insurance premiums.<br>● For additional details, see the Policy Guidance document Impact of Suspension on Pay and Benefits |

***Records Management***

| General Provisions | Application |
|---|---|
| Disciplinary Records | Agencies must update payroll and/or the human resources information system records as promptly as feasible upon issuance of a Written Notice, upon placing employees on pre-disciplinary leave or disciplinary suspension, and upon subsequent demotions or transfers with disciplinary salary actions, terminations, or reinstatements or reduction of the disciplinary action.  See the DHRM Policy Guide – Managing Corrective and Disciplinary Records. |

## GLOSSARY

Pre-disciplinary Leave    Pre-disciplinary Leave is leave with pay which is applicable when disciplinary action is being considered and the employee's removal from the workplace is necessary or prudent to allow for the completion of a disciplinary review or pre-disciplinary investigation.

Corrective Action    Any intervening verbal or written counseling action taken by a supervisor or manager to address employment problems, such as unacceptable performance, behavior, or conduct.

Counseling    Counseling may be a verbal or written intervention that consists of a dialogue between an employee and their supervisor to address and reinforce expectations of an employee's work performance, behavior, and/or conduct. Written counseling discussions must be documented in a written memorandum or the use of the Notice of Improvement Needed/Substandard Performance form.  Counseling that is related to work performance may be included in an interim performance evaluation as described in Policy 1.40, Performance Planning and Evaluation.

Criminal Charge    An arrest or indictment by law enforcement authorities against an employee for the commission of a criminal offense.

Criminal Offense    Criminal Offenses include felonies and misdemeanors as defined in the statutes of the United States, the Commonwealth of Virginia, other sovereign states, and other city and county governments. Criminal offenses shall not include traffic or other charges that are specifically differentiated and exempted from statutory criminal offenses.  However, DUI or other formal charges that impact an employee's ability to drive a vehicle or could result in incarceration if convicted shall be considered criminal charges.

Disciplinary Action    A formal action taken in response to unacceptable performance or misconduct.  Disciplinary actions include the issuance of Written Notices; suspensions; demotions; transfers; disciplinary salary actions; and terminations.

| | |
|---|---|
| Disciplinary Demotion | Management initiated assignment of an employee to the same or a different position in the same or lower Pay Band/Grade with reduced job responsibilities that must result in a minimum of a 5% reduction in base salary.  In no case may an employee's salary exceed the maximum of the pay band following a disciplinary salary action. |
| Disciplinary Review | A process that involves reviewing the facts and circumstances surrounding misconduct or unacceptable performance in order to determine if disciplinary action is warranted. |
| Disciplinary Salary Action | Employees may be retained in their current positions and have their duties reduced, be demoted, or transferred to positions in the same or lower pay band with reduced job responsibilities in lieu of termination.  The employee's salary in each case must be reduced by at least 5%.  In no case may an employee's salary exceed the maximum of the pay band following a disciplinary salary action. Agencies have the authority to transfer employees to equivalent positions as part of the disciplinary process without a reduction in salary. |
| Employee Assistance Program (EAP) | A confidential assessment, referral, and short-term problem-solving service available to eligible employees and family members. Enrollment in the EAP is automatic as part of the health plan coverage. |
| Formal Break in Service | For the purpose of this policy, a break of at least thirty days from the date of separation. Periods of leave with or without pay do not count toward satisfying this break in service. |
| Interim Evaluation | A performance evaluation completed during the performance cycle to document and assess an employee's progress toward achieving the performance plan.  Interim Performance Evaluations are not considered "official" documents and are retained in the supervisor's confidential file for use in constructing the annual performance evaluation.  Counseling, particularly when related to work performance, may be part of an interim evaluation. Prior to any pre-disciplinary or disciplinary actions employees must be given oral or written notification of an offense, an explanation of the agency's evidence in support of the charge, and a reasonable opportunity to respond.  Agencies must provide a clear and descriptive explanation of the offense in a manner that ensures that the employee understands the facts presented and will be able to present mitigating factors or denial of the charge. |
| Notice of Intent | Prior to any pre-disciplinary or disciplinary actions, employees must be given oral or written notification of an offense, an explanation of the agency's evidence in support of the charge, and a reasonable opportunity to respond.  Agencies must provide a clear and descriptive explanation of the offense in a manner that ensures that |

the employee understands the facts presented and will be able to present mitigating factors or denial of the allegations.

| | |
|---|---|
| Notice of Improvement Needed/Substandard Performance Form | A form completed by the immediate supervisor during the performance cycle to document substandard performance and the need to improve performance. This document may be issued as written counseling or may also result in issuance of a formal Written Notice.  This form must include an improvement plan, which includes an improvement period of no less than 30 days or more than 180 days. See Policy 1.40, Performance Planning and Evaluation. |
| Progressive Discipline | A system of increasingly significant measures that are utilized to provide feedback to employees so that they can correct conduct or performance problems.  It is most successful when provided in a way that helps an employee become a fully contributing member of the organization.  Progressive discipline also enables agencies to objectively, and with reliable documentation, terminate an employee who is unable or unwilling to improve their workplace conduct and/or job performance. There may be extenuating circumstances when an employee's conduct requires disciplinary action administered without employing progressive discipline. |
| Reasonable Opportunity to Respond | Employees must be given a reasonable opportunity to respond after receiving notification of an impending pre-disciplinary or disciplinary action. |
| Standards of Conduct | Positive expectations for work performance, conduct, and behavior. See Sections: Expectations for Employees and Expectations for Supervisors/Managers. |
| Suspension | An employee's absence from work, without pay, that an agency imposes as a part of a disciplinary action. |
| Unacceptable Conduct/Misconduct | Employee conduct or behavior that is inconsistent with state or agency standards for which specific corrective or disciplinary action is warranted. |
| Workday | For purposes of suspensions without pay, workday is defined as 8 hours for non-exempt employees.  For exempt employees, a workday consists of the hours scheduled to work on a normal day. |
| Workweek | A fixed period of seven consecutive 24-hour periods which is established by the employer for each employee.  It may begin on any day of the week and at any hour of the day; it need not coincide with the calendar week.  Full-time employees normally work a five-day, 40-hour schedule during a workweek. |

ATTACHMENT #9



| Book | Policy Manual |
| --- | --- |
| Section | Section 3 - Human Resources |
| Title | Faculty Sanctions |
| Code | Section 3.12 |
| Status | Active |

**Section 3**

**Human Resources**

The purpose of this section is to record the various personnel rules, regulations, policies, and procedures of the Federal and State governments, the State Board, and the System Office.  Special attention is given to the difference in provisions for faculty and classified employees.

---

**3.12 Faculty Sanctions**

Purpose: To provide fair and objective methods of addressing behavior and performance issues that interfere with the maintenance of high standards of professional conduct and work performance.

    3.12.0 Definitions
       a. Dismissal -- Dismissal is the involuntary termination of employment of faculty during the terms of their appointment.

       b. Insubordination -- Insubordination is the refusal or deliberate failure to comply with a directive of a supervisor when such directive is within the scope of authority/responsibility of the supervisor.

       c. Misconduct -- Misconduct is any criminal, immoral, or unprofessional act occurring while working for or representing the institution or any such act while on the premises of the institution or at sponsored events.  Misconduct shall include, without limitation, unauthorized taking or use of any State property, conflicts of interest, engaging in or contributing to any assault, physical abuse or threats of harm, misusing authority for personal gain or favors, unlawful discrimination, harassment and any act that materially affects or interferes with the performance of one's responsibilities or the operations of the institution.

       d. Nonreappointment -- Nonreappointment is the decision not to renew the appointment of a faculty member at the end of the current appointment period.

       e. Suspension -- The required absence from work with or without pay that is imposed as part of a disciplinary action or to remove the faculty member from the workplace pending an investigation related to conduct or a court action.
    3.12.1 Nonreappointment
       a. Coverage -- Full-time and regular part-time faculty in unrestricted positions are covered by the provisions of this section.

       b. Reasons for Nonreappointment -- Faculty may be nonreappointed only for just cause.  Permissible grounds for nonreappointment shall include but are not limited to incompetence, unsatisfactory job performance, insubordination, or misconduct.

c. Procedure -- The immediate supervisor shall schedule a conference with the faculty member. During the conference, the faculty member shall be informed of the immediate supervisor's intention to recommend nonreappointment and provided a written copy of the reasons for the recommendation. The faculty member shall have up to five (5) business days to discuss and/or respond to the recommendation in writing. If the supervisor recommends nonreappointment after consideration of any response from the faculty member, a copy of the recommendation, response and any other pertinent materials shall be forwarded to the vice president/executive vice president/provost. In circumstances involving a direct report of a vice president/executive vice president/provost, the vice president/executive vice president/provost's recommendation or decision is binding. In cases involving a vice president, executive vice president, provost, or direct report to the president, the president's decision is binding. The faculty member shall be notified in writing of the final decision regarding nonreappointment.

Nothing in the procedure described herein shall prevent the president or the president's designee from taking appropriate action to not reappoint a faculty member.

d. Time Frames -- The notification of nonreappointment shall be sent to the faculty member not later than the following dates:

(1) March 15 during the probationary, second year of employment, and third year of employment as teaching faculty in the VCCS.

(2) January 15 for teaching faculty in the last year of a multi-year appointment; and other teaching faculty who are on one year appointments, but who are not in their probationary, second, or third year of employment.

(3) January 15 for administrative and professional faculty.

3.12.2 Dismissal
a. Coverage -- All full-time faculty and regular part-time nine-month teaching faculty are covered by this policy.

b. Reasons for Dismissal -- Faculty may be dismissed only for just cause. Permissible grounds for dismissal shall include but are not limited to incompetence, unsatisfactory performance of duties, insubordination, unlawful discrimination, sexual or workplace harassment, and misconduct.

c. Procedure -- The immediate supervisor of a faculty member may initiate dismissal proceedings whenever sufficient justification exists to consider dismissal for just cause. In all cases, the supervisor must demonstrate that credible evidence is present to justify dismissal. The immediate supervisor shall schedule a conference with the faculty member. During the conference, the faculty member shall be informed both orally and in writing of the justification for considering dismissal and shall have the opportunity to discuss and respond to the issue. The immediate supervisor shall identify the required corrective action unless immediate dismissal is recommended.

Following the conference, a faculty member may have up to five (5) business days to submit a written response and/or additional information to the immediate supervisor for consideration. If the supervisor recommends dismissal after consideration of any response from the faculty member, a copy of the recommendation, response and any other pertinent materials shall be forwarded to the vice president/executive vice president/provost. In circumstances involving a direct report of a vice president/executive vice president/provost, the vice president/executive vice president/provost's recommendation or decision is binding. In cases involving a vice president, executive vice president, provost, or direct report to the president, the president's decision is binding. The vice president/executive vice president/provost or president shall notify the faculty member in writing of the decision. If the decision is to dismiss, the letter will include the effective date.

Nothing in the procedure described herein shall prevent the president or the president's designee from taking appropriate action to dismiss a faculty member.

d. Exceptional Cases -- The initial recommendation of dismissal may be issued from the vice president/executive vice president/provost or the president instead of the immediate supervisor. In all such cases, the faculty member shall be notified of the identity of the person making the initial recommendation.

3.12.3 Suspension
a. Coverage -- All faculty are covered by this policy.

b. Use in Dismissal Cases -- Suspension of faculty is not to be used routinely in possible dismissal cases. Such use is justified only if a substantial threat to the welfare of the institution can reasonably be interpreted as meaning that the faculty member's continuance at the institution will cause immediate harm to the faculty member or others or materially affects or interferes with the performance of one's responsibilities, or the operations of the institution. The president shall determine whether suspensions are with or without pay, within legal guidelines.

c. Procedure -- Nothing in the procedure described herein shall prevent the president or the president's designee from suspending a faculty member. Prior to taking such action, vice president/executive vice president/provost shall inform the affected faculty member of the reason for the suspension and provide the faculty member an informal opportunity to respond to the allegations.

d. Investigations -- The vice president/executive vice president /provost shall ensure that an investigation be conducted and completed within thirty (30) calendar days of the date of the start of the suspension. Upon conclusion of the investigation, court action, or official investigation, the faculty member may be disciplined, dismissed, suspended, or reinstated from suspension as the vice president/executive vice president/provost determines to be appropriate under the circumstances.

e. Though suspensions are generally with pay, a suspension without pay for up to thirty (30) work days may be utilized as a disciplinary action in lieu of dismissal.

3.12.4 General Provisions

a. Academic Freedom -- Faculty sanctions shall not be used to restrain faculty in their exercise of constitutional rights or academic freedom as set forth in the Statement of Academic Freedom and Responsibility adopted by the State Board.

b. Appeals -- Decisions made under the provisions of the Sanctions policy may be appealed through the Faculty Grievance Procedure.

   1. Appeals of nonreappointments, dismissals, and suspensions must be filed within twenty (20) work days after receipt of notification of nonreappointment, dismissal or suspension.

   2. Adjunct Faculty may appeal suspension and dismissal issues to the end of Level Two of the Faculty Grievance Procedure.

   3. Associate Instructors may appeal dismissals and suspension issues to the end of Level Three of the Faculty Grievance Procedure

c. Extension of Time -- Every effort shall be made by all parties to expedite the process. The time limitations specified for either party may be extended by mutual written agreement.

d. Delivery of Notices -- When giving notice of action or requesting appeal, it is the author's responsibility to make all reasonable effort to ensure that the person(s) designated to receive such notices and requests receive(s) them personally. Personal delivery by the author or certified mail with return receipt or other delivery forms that provide a receipt should be used for the delivery of notices and requests when appropriate.

ATTACHMENT #10

**From:** Credle, JoAnn O.
**Sent:** Wednesday, July 13, 2022 9:51 AM
**To:** Mucci, Diane M. <dmucci@nvcc.edu>
**Subject:** anxiety attack

I saw that you were free from the contact list, walked to you office and your administrator told me you were on zoom.  I was walking in the hallway and saw you talking to the administrator.  I saw you and felt like you did not want to talk to me and that is when the attack started.

I was unable to put my leave in- I have a new computer with Window 11 and some applications are not showing up.

When I come back, I will find a computer on campus and complete the leave , so I will not get in trouble.

**From:** Credle, JoAnn O.
**Sent:** Wednesday, July 13, 2022 3:26 PM
**To:** Mucci, Diane M. <dmucci@nvcc.edu>
**Subject:** RE: ADA Contact and EAP Information

Thank you- I will forward to my lawyer.

**From:** Mucci, Diane M. <dmucci@nvcc.edu>
**Sent:** Wednesday, July 13, 2022 1:53 PM
**To:** Credle, JoAnn O. <jcredle@nvcc.edu>
**Subject:** ADA Contact and EAP Information

Hello JoAnn,

I requested information from HR to send to you about accommodations and the employee assistance program.

Medical accommodations can be requested through the ADA office. The contact is ADA@NVCC.EDU

NOVA's EAP information is below and attached:

NOVA Cares' website has list of resources (http://www.nvcc.edu/novacares/resources.html).

- NOVA Benefits: benefits@nvcc.edu
- EAP: See attached; http://www.dhrm.virginia.gov/employeeprograms/employeeassistance
- Mental Health Provide Database: http://nvcc.rints.com/
- National Suicide Prevention Lifeline: 1.800.273.8255; http://www.suicidepreventionlifeline.org/
- Virginia Veteran Services: 804.786.0286; https://www.dvs.virginia.gov/virginia-veteran-and-family-support-2/
- Community Service Board: Community Services Board - Prince William/Manassas: 703.792.7800 (Manassas) or 703.792.4900 (Woodbridge); Community Services Board - Fairfax/Falls Church: 703.573.5679 (emergency) or 703.383.8500


Please take care, we can talk or you may want to set an appointment with HR directly tomorrow.

Diane

**Diane Mucci, Ph.D.**
Provost, Annandale Campus

CFH 202
8333 Little River Turnpike, Annandale, VA, 22003
703-503-6383/ dmucci@nvcc.edu / nvcc.edu

**CONFIDENTIALITY NOTICE:** This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise be protected by law. Any access, use, disclosure or distribution of this email message by anyone other than the intended recipient(s) is unauthorized and prohibited. If you are not an intended recipient (or an agent acting on an intended recipient's behalf), please contact the sender by reply email and immediately destroy all copies of the original message. Virus scanning is recommended on all email attachments.

ATTACHMENT #11

**From:** Mucci, Diane M. <<u>dmucci@nvcc.edu</u>>
**Sent:** Wednesday, July 20, 2022 11:13 AM
**To:** Credle, JoAnn O. <<u>jcredle@nvcc.edu</u>>
**Subject:** Updates with new information

Hello JoAnn,

There are a few items I need to discuss with you. We can discuss them this week or next.

- We need to complete your annual evaluation and to do so, I need a self-assessment, even if it's just a list of activities and projects that you have worked on over the past evaluation cycle, July 1, 2021 – June 30, 2022.  I need the assessment from you by COB Friday July 22.  Once I have that, we can set up a time to discuss the evaluation next week.  If you still wish to have an representative from HR present, I will arrange it at a time when a representative from employee relations is available. HR's role is to act a neutral party and explain any questions related to policy or procedure.

- I have asked Kelly to enter the SDV course for the FFX county cohort for Friday mornings at 8am.  You will need to teach this course, I have reviewed your EWP and it states that you should be teaching 2 sections of SDV each semester and one each summer.  This will be a very good way to interface with those students and assist them in a very deliberate and thoughtful way.

- As our AN campus business needs are changing, starting Monday, August 8th it is my expectation that you work a normal 5 day work week, 8am to 4:30pm. This will enable you to teach the SDV course and be available to the students.

- Barbara Hopkins will be meeting with the Arlington Sheriff's office this week by herself. She will bring the information back to you and then, in collaboration with her, you can move forward in the creation of a plan to meet their course needs.

Sincerely,
Diane

**Diane Mucci, Ph.D.**
Provost, Annandale Campus
CFH 202
8333 Little River Turnpike, Annandale, VA, 22003
703-503-6383/ <u>dmucci@nvcc.edu</u> / <u>nvcc.edu</u>



CONFIDENTIALITY NOTICE: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise be protected by law. Any access, use, disclosure or distribution of this email message by anyone other than the intended recipient(s) is unauthorized and prohibited. If you are not an intended recipient (or an agent acting on an intended recipient's behalf), please contact the sender by reply email and immediately destroy all copies of the original message. Virus scanning is recommended on all email attachments.

ATTACHMENT #12

**From:** Kress, Anne <akress@nvcc.edu>
**Sent:** Thursday, July 21, 2022 9:45 AM
**To:** Credle, JoAnn O. <jcredle@nvcc.edu>; Calobrisi, Charlotte M. <ccalobrisi@nvcc.edu>; Currie, Tammy H. <tcurrie@nvcc.edu>; Mucci, Diane M. <dmucci@nvcc.edu>
**Subject:** Re: meeting

Dear Joann,

I cannot speak to what Barbara Hopkins might have said to you, but as you know from our previous discussions, neither I nor my office defines the scope of responsibilities assigned you by your direct supervisor, Provost Mucci.

I encourage you to speak with the Provost regarding any questions related to your job description and assigned duties. I have copied her so that she is aware of your concerns.

Sincerely,

Anne

_____

**Anne M. Kress, PhD**
President
*she/her/hers*

Brault Building
4001 Wakefield Chapel Road
Annandale, VA 22003
Office: 703.323.3101

CONFIDENTIALITY NOTICE: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise be protected by law. Any access, use, disclosure or distribution of this email message by anyone other than the intended recipient(s) is unauthorized and prohibited. If you are not an intended recipient (or an agent acting on an intended recipient's behalf), please contact the sender by reply email and immediately destroy all copies of the original message. Virus scanning is recommended on all email attachments.

**From:** Credle, JoAnn O. <jcredle@nvcc.edu>
**Date:** Thursday, July 21, 2022 at 9:37 AM
**To:** Calobrisi, Charlotte M. <ccalobrisi@nvcc.edu>, Currie, Tammy H. <tcurrie@nvcc.edu>
**Cc:** Kress, Anne <akress@nvcc.edu>
**Subject:** meeting

Do you have any time today?  I was told by Barbara Hopkins that Mucci told her the President do not want me to go out and set up programs.  This was not in the my letter that was issued to me when I was allowed to come back to work.  So it seem that if I can set up programs, I am useless.

ATTACHMENT #13

# NOVA | Northern Virginia Community College

Form 105-192
Rev. 08/21
Page 1 of 2

## Accommodation Request Form

### Background Information

Employee Name Joann Credle                                  Position/Title Counselor

Phone Number 703 615 4358                                    Email Address jcredle@nvcc.edu

Work Location Annandale Campus

### Supervisor Information

Supervisor's Name Dr. Dingebec.          Title Provost

Phone Number (703) 323-3000          Email Address Dncc @ nvcc.edu

**1. Please describe which major life activity your condition limits.** (For example: caring for oneself, performing manual tasks, walking, seeing, hearing, sitting, speaking, breathing, learning, remembering, concentrating, etc.).

Inability to teach courses without fear of panic attacks. Unable to concentrate, unable to breathe normally when exposed to triggers in the environment; unable to speak when experiencing the intense feelings of anxiety and panic; unable to remain in the environment when experiencing a surge of intense and rapid heart beats that impairs my thinking and completing tasks.

**2. Describe how your condition limits your ability to perform the essential functions of your job.** Using your Employee Work Profile or faculty work plan (job description), identify the essential functions affected and be specific about how the medical condition impairs your ability in each instance. (Your Employee Work Profile can be obtained through your immediate supervisor or through the Division of Human Resources. Faculty work plans can be obtained through department chairs or directors.)

I am an administrative-faculty member that requires working collaboratively with stakeholders, students and administering special programs. This condition has hindered my effectiveness in the classroom and working collaboratively with colleagues who subjected me to the traumatizing incident. I have excessive worry about having panic attacks. I try to avoid the environmental triggers so that I will not experience the intense feelings of panic and anxiety. I cannot function in the present work environment without having to rapidly leave the building to sit in my care until the panic attack subsides.

Form 105-192
Rev. 08/21
Page 2 of 2

**3. Describe in detail the accommodation(s) you are requesting.**

I need to be released from teaching classes until the condition is resolved. I need to be assigned to a different unit and supervisor. My present location is a trigger. The symptoms are debilitating and embarrassing. I feel that I am in a hostile environment and the anxiety of entering the area is impairing. I have never experienced anything like this is my entire life.

**4. Please add any additional information you feel may be relevant to your request.**

The manner in which I was dismissed from my work environment and responsibilities was traumatizing. I feel that I have lost the respect of my students, peers and community stakeholders. I was stripped of my sense of self and perception of competence. I struggle with a depressed mood, but I find the panic attacks the most debilitating. I struggle to rationalize such maltreatment at this stage of my career. I need the opportunity to return to pre-crisis functioning with the support of accommodations.

Please have your medical provider complete the Medical Professional's Documentation of Disability and submit it with this form to the ADA Coordinator, 3926 Pender Dr. Suite 150, Fairfax, VA 22030 or ada@nvcc.edu.

Employee Signature_____Date_____



**NOVA** | Northern Virginia
Community College

Form 105-194
Rev. 08/21
Page 1 of 2

# Medical Professional's Documentation of Disability

### To the Employee

In order to review your request for accommodations in the workplace, information is needed from your treating medical professional. Please review your Employee Work Profile (job description) or faculty work plan (job description) and/or job responsibilities with your medical provider and have your provider complete this form. Return this form, along with your Accommodations Request Form, to ada@nvcc.edu. This information must be received to process your request.

All medical-related information shall be kept confidential and maintained separately from other personnel records. However, supervisors and managers may be advised of information necessary to make the determinations they are required to make in connection with
a request for an accommodation. First aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment or if any specific procedures are needed in the case of fire or other evacuations.

Employee Name ___Joann Credle___

Employee Signature_____ Date_____

### To the Medical Professional

As part of the accommodation process, documentation that an employee has a qualifying disability is required. Please complete this form, or attach a separate page with answers to the following questions.

The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information.

Name ___Kelly Woodruff, MD___ Work Phone ___252·636·2664___
Title/Specialty ___Internal Medicine___
Address ___3252 Wellons Blvd, NewBern, NC 28562___
Signature ___(signature)___ Date ___07/29/2022___

### 1. Does the employee currently have a physical or mental condition?

If yes, what is the nature and severity of the condition?

☑ yes ☐ no

see attached

### 2. Is the condition permanent?

If no, how long do you expect the impairment to last?

☐ yes ☐ no

? unknown

see attached

Form 105-194
Rev. 08/21
Page 2 of 2

**3. Does the condition substantially limit a major life activity?**     ☑ yes ☐ no

If yes, what activity(ies)? *(Examples of major life activities include, but are not limited to: speaking, hearing, seeing, breathing, walking, standing, sitting, sleeping, reaching, learning, concentrating, thinking, caring for oneself, interacting with others and performing manual tasks.)*

see attached

**5. Does the condition substantially limit a major bodily function?**     ☑ yes ☐ no

If yes, what function? *(Examples of major bodily functions include, but are not limited to: circulatory, endocrine, reproduction, hemic, special sense organs and skin, lymphatic, immune, normal cell growth, digestive, neurological, brain, respiratory, bowel, bladder, genitourinary, musculoskeletal and cardiovascular.)*

see attached

**6. Describe how this condition limits the employee's ability to perform the essential functions of the job.** Using the Employee Work Profile (job description) or Faculty Work Plan (job description), identify the essential functions affected and how the medical condition impairs the employee in each instance.

see attached

**7. What accommodation(s), if any, do you believe will enable the employee to perform the essential job functions, and how long do you believe the accommodation will be necessary?**

see attached

**8. Please include any additional documentation to support the request for accommodation.**

see attached

Please return this form to the employee.



| Encounter Date: | **07/29/2022**   Type of Service: **LETTER** | | | |
| --- | --- | --- | --- | --- |
| Patient Name: | **JOANN O. CREDLE** | | DOB: | Oct 03, 1953 |
| MRN: | **2149170** | | Age: | 68  Sex: F |
| Owner: | KULLY WOODRUFF M.D. | | Ref Prov: | |

7/29/22

1. Does the employee currently have a physical or mental condition? Yes. She after a recent incident at work she has developed anxiety and panic like symptoms.
2. Is the condition permanent? Unknown.
3. Does the condition substantially limit a major life activity? During panic like attacks she has difficulty breathing, speaking, thinking clearly, interacting with others, performing manual tasks, among others.
4. Does the condition substantially limit a major bodily function? During panic like attacks, as noted above, she has difficulty breathing, heart racing, among others.
5. Describes how this condition limits the employee's ability to perform the essential functions of the job. If panic like symptoms were to ensue, she would be unlikely to continue teaching / instruction for an undefined period of time until symptoms resolve.
6. What accommodation(s), if any, do you believe will enable the employee to perform the essential job functions, and how long do you believe the accommodations will be necessary? She would likely benefit from being excused from teaching obligations for the fall semester. Reassess symptoms in 6 months.

Kully Woodruff, MD

Electronically signed by:KULLY  WOODRUFF M.D.  Jul 29 2022  7:28PM Eastern Standard Time Author


## NOVA | Northern Virginia Community College

Form 105–194
Rev. 08/21
Page 1 of 2

## Medical Professional's Documentation of Disability

### To the Employee

In order to review your request for accommodations in the workplace, information is needed from your treating medical professional. Please review your Employee Work Profile (job description) or faculty work plan (job description) and/or job responsibilities with your medical provider and have your provider complete this form. Return this form, along with your Accommodations Request Form, to ada@nvcc.edu. This information must be received to process your request.

All medical-related information shall be kept confidential and maintained separately from other personnel records. However, supervisors and managers may be advised of information necessary to make the determinations they are required to make in connection with

a request for an accommodation. First aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment or if any specific procedures are needed in the case of fire or other evacuations.

Employee Name    _Joann Credle_

Employee Signature    _Jean Credle_    Date _8/19/22_

### To the Medical Professional

As part of the accommodation process, documentation that an employee has a qualifying disability is required. Please complete this form, or attach a separate page with answers to the following questions.

The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information.

Name    Philicia Jefferson, Ph.D., LPC, CRC, BCFMHE    Work Phone 540 834 7627

Title/Specialty    Clinical Mental Health & Rehabilitative Specialist

Address    P.O. Box 42111 Fredericksburg, Va 22404

Signature    _Philicia Jefferson_    Date 08/19/2022

**1. Does the employee currently have a physical or mental condition?**  ☐ ☐
   YES

If yes, what is the nature and severity of the condition?

Dr. Credle meets the clinical criteria for panic disorder - F41.0. She also exhibits symptoms of anxiety and struggles with depressed mood.

**2. Is the condition permanent?**  ☐ ☒

If no, how long do you expect the impairment to last?
Re-evaluation in 6 months

Form 105–194
Rev. 08/21
Page 2 of 2

**3. Does the condition substantially limit a major life activity?**    ■yes ☐

If yes, what activity(ies)? *(Examples of major life activities include, but are not limited to: speaking, hearing, seeing, breathing, walking, standing, sitting, sleeping, reaching, learning, concentrating, thinking, caring for oneself, interacting with others and performing manual tasks.)*

The condition significantly impairs concentration, interacting with others, lecturing, thinking, and sleeping.

**5. Does the condition substantially limit a major bodily function?**    ■yes ☐

If yes, what function? *(Examples of major bodily functions include, but are not limited to: circulatory, endocrine, reproduction, hemic, special sense organs and skin, lymphatic, immune, normal cell growth, digestive, neurological, brain, respiratory, bowel, bladder, genitourinary, musculoskeletal and cardiovascular.)*

The level of intensity of the panic attacks impairs breathing.

**6. Describe how this condition limits the employee's ability to perform the essential functions of the job.** Using the Employee Work Profile (job description) or Faculty Work Plan (job description), identify the essential functions affected and how the medical condition impairs the employee in each instance.

Teaching: fear of panic attacks impairs delivery of oral content, concentration, and interactions with others.

**7. What accommodation(s), if any, do you believe will enable the employee to perform the essential job functions, and how long do you believe the accommodation will be necessary?**

Dr. Credle needs to avoid classroom instructing until the condition is under control, this would foster recovery. She would also benefit from a change of work environment
until the panic attacks have subsided. A gradual return to the environment is recommended. Triggers in the present work location exacerbates the condition.

**8. Please include any additional documentation to support the request for accommodation.**

Diagnostic assessment is attached and primary care physician's review.

Please return this form to the employee.

ATTACHMENT #13.1



# Psychotherapy Intake Note

NCCI Integrative Behavioral Services
Clinician:   Philicia Jefferson, Ph.D.
Patient:   Joann Credle, DOB 10/3/1953

Date and Time:   August 16, 2022 9:15PM - 10:45PM
Duration:   90 minutes
Service Code:   90791
Location:   Telehealth
Participants:   Client only

## Presenting Problem

Dr. Credle states that she is experiencing an abrupt surge of intense discomfort that reaches its peak within minutes. During the episodes she experiences palpitations, an accelerated heart rate, sensations of shortness of breath, unsteadiness and light-headed, chest discomfort and fear of losing control in front of students. She is constantly worried about having panic attacks in her place of work. She finds herself hastily exiting the environment to avoid embarrassment and to reduce the intensity of the panic attacks. This condition impairs her ability to perform routine work-related tasks. Excessive worry and inhibitions related to classroom instruction, interaction with colleagues who subjected her to a demeaning work-related incident trigger episodes of panic. She worries excessively about the possibility of repeated panic attacks in the workplace. It is a humiliating experience particularly in the presence of her students during lectures. She has to remove herself immediately from the environment to be able to breathe normally and to focus. She has to breathe through her mouth to gain oxygen and to avoid fainting.The condition has persisted for more than a month. The origin of the condition is linked to an attack that she experienced by her supervisor who falsely accused her of being a threat to others and being unprofessional in the workplace. She feels devastated by the experience after having served the institution for over 25 years. The allegation resulted in a mandatory dismissal and release of duties. She describes the unfounded allegations as traumatic and has resulted in a significant mental health impairment requiring professional support.

## Current Mental Status

| | |
|---|---|
| Orientation: | X3: Oriented to Person, Place, and Time |
| General Appearance: | Appropriate |
| Dress: | Appropriate |
| Motor Activity: | Unremarkable |
| Interview Behavior: | Appropriate |
| Speech: | Normal |
| Mood: | Anxious |
| Affect: | Congruent |
| Insight: | Good |
| Judgment/Impulse Control: | Good |
| Memory: | Intact |
| Attention/Concentration: | Distractible |
| Thought Process: | Unremarkable |
| Thought Content: | Appropriate |
| Perception: | Unremarkable |
| Functional Status: | Intact |

## Risk Assessment

Patient denies all areas of risk. No contrary clinical indications present.

## Objective Content



# Psychotherapy Intake Note

NCCI Integrative Behavioral Services

Clinician:  Philicia Jefferson, Ph.D.

Patient:    Joann Credle, DOB 10/3/1953

Date and Time:  August 16, 2022 9:15PM - 10:45PM

Duration:       90 minutes

Service Code:   90791

Location:       Telehealth

Participants:   Client only

---

Dr. Credle stated that she is no longer able to cope in the work environment after being suspended for allegations of incompetence and unprofessional behaviors in the workplace. After a human resources investigation she was allowed to return to work. She states that she cannot function in the specific work setting. The individuals that filed the complaints against her are now triggers to the panic attacks. She states when she see them, hear their voices or have to interact with them, she panics. She also worries about what her students knowing about the allegations and colleagues whom she had effective working relationships with over the 25 years of her tenure. She stated that the incident was related to a major program that she facilitated with an expected attendance of 300 people. She had collaborated with numerous community stakeholders and was expected to participate in the event. However, three days prior to the activity she was dismissed from the workplace and not allowed to attend the program or to greet the attendees. She stated it took months to coordinated the activity to be rewarded with public humiliation and false allegations. Dr. Credle who had an impeccable reputation with students whom she served, colleagues and community stakeholders for more than 25 years.



# Psychotherapy Intake Note

NCCI Integrative Behavioral Services
Clinician:  Philicia Jefferson, Ph.D.
Patient:     Joann Credle, DOB 10/3/1953

Date and Time:  August 16, 2022 9:15PM - 10:45PM
Duration:           90 minutes
Service Code:     90791
Location:           Telehealth
Participants:      Client only

## Biopsychosocial Assessment

Identification:
Dr. Credle is a career community college administrative-faculty whose primary responsibility is serving student organizations and special program participants..

History of Present Problem:
The onset of the condition is related to her perceived the defamation of character and unfair suspension from the workplace. Dr. Credle believes that the hostility that she is continuously subjected to on the specific campus is associated with her age and ethnicity. The incident occurred in the absence of the Associate Vice President who attested to the integrity of Dr. Credle. Dr. Credle was allowed to return to her position but was traumatized by the incident and is unable to function presently in environment in which the trauma occurred. The symptoms have persisted for more than a month.

Psychiatric History:
Dr. Credle has no previous mental health history

Trauma History:
Critical incident was an act of hostility toward Dr. Credle, unfair dismissal from her workplace for two weeks based on false allegations of unprofessional behaviors. The timing of the dismissal was traumatizing because of its relationship to a major event that she facilitated for nearly 300 visitors on the campus.She had collaborated with stakeholders, found the venue for the function, assisted with promoting the event, and other administrative functions. Dr. Credle worked on this event along with other supporters for several months prior to the event date. She was dismissed from the project 3 days prior to the event after all the major preparations had been completed shaming Dr. Credle in the eyes of stakeholders and smearing her professional reputation with students, with the numerous community supporters and colleagues.

Family Psychiatric History:     none reported.
Medical Conditions & History:   none reported
Current Medications:            none reported
Substance Use:                  none reported
Family History:                 Parents are deceased - no close family members in the region
Social History:
Dr. Credle has a history of supportive relationships throughout the community and the college environment.
Spiritual/Cultural Factors:
Dr. Credle embraces Christian theology and considers it to be important part of her daily life.
Developmental History:          unremarkable
Educational/Vocational History: doctorate level education
Legal History:                  none
SNAP:                           personable, intellectual and hardworking
Other Important Information:
Dr. Credle now perceives the work environment as hostile. She is unable to resume normal job functions; she fears having panic attacks during class lectures and continues to experience episodes of anxiety and panic when exposed to triggers associated with the traumatizing incident.

## Plan

Pursue accommodations in the workplace that will support a change of venue while trying to overcome debilitating mental health symptoms. Dr. Credle's condition is work-related and is debilitating. It could also have long-term residual effects.



# Psychotherapy Intake Note

NCCI Integrative Behavioral Services
Clinician:  Philicia Jefferson, Ph.D.
Patient:    Joann Credle, DOB 10/3/1953

Date and Time: August 16, 2022 9:15PM - 10:45PM
Duration:      90 minutes
Service Code:  90791
Location:      Telehealth
Participants:  Client only

## Diagnosis

F41.0      Panic Disorder

Philicia Jefferson, Ph.D., Director signed this note and declared this information to be accurate and complete on August 18, 2022 at 10:19PM.